**John F. CANT, Plaintiff,**

**v.**

**A. G. BECKER & CO., INC.,**
**Defendant.**

**No. 71 C 1324.**

United States District Court,
N. D. Illinois.

March 28, 1974.

Sheldon I. Saitlin, Simpson & Shefsky, Chicago, Ill., for plaintiff.

James T. Griffin and Richard T. Zwirner, Hubachek, Kelly, Rauch & Kirby, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the stipulation of the parties that this matter is submitted to the Court for decision pursuant to Rule 39(b) of the Federal Rules of Civil Procedure. The parties have further stipulated that this Court's decision is to be based on the pleadings, depositions and exhibits thereto, interrogatories and answers, stipulations and exhibits thereto, and affidavits filed by the parties in support of their respective positions.

The plaintiff in the instant action seeks to redress alleged violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

The plaintiff, John F. Cant ("Cant") is a physician residing in the Chicago metropolitan area. The defendant A. G. Becker & Co., Inc. ("Becker") is a Delaware corporation. During all times relevant hereto Becker was engaged in the

retail sale of securities from various business locations in the Chicago metropolitan area. Becker has been, at all times relevant to this suit, a broker and dealer of securities within the meaning of Sections 3(a)(4) and (5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(4) and (5). The jurisdiction of this Court is alleged to be based upon Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Section 22 of the Securities Act of 1933, 15 U.S.C. § 77a et seq.

The plaintiff in the complaint makes the following allegations *inter alia*:

1. Plaintiff maintained several accounts with defendant beginning in approximately 1944 until approximately late 1969, at which time plaintiff removed his accounts from defendant. All of plaintiff's securities transactions from 1944 until approximately late 1969 were transacted through defendant. All purchases of securities by plaintiff were made based upon recommendations initiated by defendant who frequently and regularly telephoned plaintiff for the specific purpose of suggesting the purchase by plaintiff of certain securities. Plaintiff seldom, if ever, in the twenty-five years during which plaintiff conducted his securities transactions through defendant, purchased any securities except those specifically recommended to plaintiff by defendant. Defendant knew that plaintiff relied upon defendant's recommendations and that as a matter of course plaintiff always accepted defendant's recommendations.

2. On approximately November 19, 1968, ·defendant initiated a telephone call to plaintiff for the purpose of specifically recommending to plaintiff the purchase of shares of Red Rope Industries Inc. ("Red Rope"), a security traded in the over-the-counter securities market. In reliance upon the recommendation made by defendant, plaintiff authorized the purchase on his behalf of 1,000 shares of Red Rope. Defendant then sold and delivered from its own inventory, as principal and on its own behalf, said shares of Red Rope to plaintiff. A *confirmation* statement sent by defendant through the United States Mails and received by plaintiff indicated an aggregate purchase price of $7,250.00, which amount was paid to defendant. Since the date of purchase the value of the 1,000 shares of Red Rope, which are presently still owned by plaintiff, has declined and a recent per share bid price quoted in the National Daily Quotation Bureau Service was approximately $2.00 or an aggregate value of approximately $2,000.00.[1]

3. On approximately December 16, 1968, defendant initiated a telephone call to plaintiff for the purpose of specifically recommending to plaintiff that he purchase shares of Red Rope, a security traded in the over-the-counter securities market. In reliance upon the recommendation made by defendant, plaintiff authorized the purchase on his behalf of 1,500 shares of Red Rope. Defendant then sold and delivered from its own inventory, as principal and on its own behalf, said shares of Red Rope to plaintiff. A confirmation statement sent by defendant through the United States Mails and received by plaintiff indicated an aggregate purchase price of $10,687.50, which amount was in fact paid to defendant. Since the

---

1. Plaintiff prays in Counts I and IV of the complaint for the alleged violations stated in paragraphs 8 and 9 below, that a judgment be entered in favor of plaintiff in the sum of $5,250.00, and in addition, interest thereon at eight per cent per annum since November 19, 1968, plus costs.

date of purchase, the value of the 1,500 shares of Red Rope, which are presently still owned by plaintiff, has declined and a recent per share bid price quoted in the National Daily Quotation Bureau Service was approximately $2.00 or an aggregate value of approximately $3,000.[2]

4. On approximately March 19, 1969, defendant initiated a telephone call to plaintiff for the purpose of specifically recommending to plaintiff that he purchase shares of Red Rope, a security traded in the over-the-counter securities market. In reliance upon the recommendation made by defendant, plaintiff authorized the purchase on his behalf of 500 shares of Red Rope. Defendant then sold and delivered from its own inventory, as principal and on its own behalf said shares of Red Rope to plaintiff. A confirmation statement sent by defendant through the United States Mails and received by plaintiff indicated an aggregate purchase price of $3,500.00, which amount was in fact paid to defendant. Since the date of purchase, the value of the 500 shares of Red Rope, which are presently still owned by plaintiff, has declined and the present per share bid price is quoted in the National Daily Quotation Bureau Service at approximately $2.00 or an aggregate value of approximately $1,-000.00.[3]

5. On approximately July 19, 1969, defendant initiated a telephone call to plaintiff for the purpose of specifically recommending to plaintiff the purchase of shares of Rancher's Exploration and Development Corp. ("Ranchers"), a security traded in the over-the-counter securities market. In reliance upon the recommendation made by defendant, plaintiff authorized the purchase on his behalf of 600 shares of Ranchers. Defendant then sold and delivered from its own inventory, as principal, and on its own behalf said shares of Ranchers to Plaintiff. A confirmation statement sent by defendant through the United States Mails and received by plaintiff indicated an aggregate purchase price of $26,700.00, which amount was paid to defendant. On March 24, 1970, a 2 for 1 stock split occurred which resulted in plaintiff's 600 shares of Ranchers becoming 1,200 shares of Ranchers. On April 23, 1970, plaintiff sold the shares of Ranchers attributable to this purchase. The net sales price received by plaintiff was $23,676.00.[4]

6. On approximately October 14, 1968, defendant initiated a telephone call to plaintiff for the purpose of specifically recommending to plaintiff the purchase of shares of Ranchers, a security traded in the over-the-counter securities market. In reliance upon the rec-

---

2. Plaintiff prays in Counts II and V of the complaint for the alleged violations stated in paragraphs 8 and 9 below, that a judgment be entered in favor of plaintiff in the sum of $7,687.50, and in addition, interest thereon at eight per cent per annum since December 16, 1968, plus costs.

3. Plaintiff prays in Counts III and IV of the complaint for the alleged violations stated in paragraphs 8 and 9 below, that a judgment be entered in favor of plaintiff and against defendant in the sum of $2,500.00 and in addition, interest thereon at eight per cent per annum since March 19, 1969 plus costs.

4. Plaintiff prays in Counts X and XIII of the complaint for the alleged violations stated in paragraphs 8 and 9 below, that a judgment be entered in favor of plaintiff and against defendant in the sum of $3,024.00 (the difference between purchase price and sale price as described above respectively) and in addition, interest thereon at eight per cent per annum since July 19, 1968, plus costs and that the Court grant the plaintiff any and all other relief that it deems appropriate.

ommendation made by defendant, plaintiff authorized the purchase on his behalf of 200 shares of Ranchers. Defendant then sold and delivered from its own inventory, as principal, and on its own behalf, said shares of Ranchers to plaintiff. A confirmation statement sent by defendant through the United States Mails and received by plaintiff indicated an aggregate purchase price of $8,500.00, which amount was paid to defendant. On March 24, 1970, a 2 for 1 stock split occurred which resulted in plaintiff's 200 shares of Ranchers becoming 400 shares of Ranchers. On April 23, 1970, plaintiff sold the shares of Ranchers attributable to the purchase described above. The net sales price received by plaintiff was $7,941.50.[5]

7. On approximately June 18, 1969 defendant initiated a telephone call to plaintiff for the purpose of specifically recommending to plaintiff the purchase of shares of Ranchers, a security traded in the over-the-counter securities market. In reliance upon the recommendation made by defendant, plaintiff authorized the purchase on his behalf of 500 shares of Ranchers. Defendant then sold and delivered from its own inventory, as principal, and on its own behalf, said shares of Ranchers to plaintiff. A confirmation statement sent by defendant through the United States Mails and received by plaintiff indicated an aggregate purchase price of $16,187.50, which amount was paid to defendant. On March 24, 1970 a 2 for 1 stock split occurred which resulted in plaintiff's 500 shares of Ranchers becoming 1,000 shares of Ranchers. Since the date of purchase as set forth above, the value of the 1,000 after split shares of Ranchers, which are presently still owned by plaintiff, has declined and a recent quotation was approximately $15.25 per share or an aggregate value of approximately $15,250.00.[6]

8. In all the above described transactions no disclosures were made at the time of the communication initiated by defendant that defendant was recommending for purchase by plaintiff a security which was owned by defendant and which was in fact sold and delivered to plaintiff out of defendant's own inventory with defendant acting as a principal in the transaction and not acting as agent. Failure by defendant to make full and complete disclosure to plaintiff that defendant was acting as principal in the aforedescribed recommended transactions and that an adverse interest existed in the transaction constituted a fraud and deceit upon plaintiff as those terms are used in Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the General Rules and Regulations promulgated thereunder.[7] De-

5. Plaintiff prays in Counts XI and XIV of the complaint for the alleged violations stated in paragraphs 8 and 9 below, that a judgment be entered in favor of plaintiff and against defendant in the sum of $558.50 (the difference between purchase price and sale price as described above respectively) and in addition, interest thereon at eight per cent per annum since October 14, 1968, plus costs and that the Court grant the plaintiff any and all other relief that it deems appropriate.

6. Plaintiff prays in Counts XII and XV of the complaint for the alleged violations stated in paragraphs 8 and 9 below, that a judgment be entered in favor of plaintiff and against defendant in the sum of $937.50 (the difference between purchase price and current market prices as described above) and in addition, interest thereon at eight per cent per annum since June 18, 1969, plus costs, and that the Court grant the plaintiff any and all other relief that it deems appropriate.

7. Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any

fendant used means and instrumentalities of interstate commerce, and the United States Mails, to so induce plaintiff to act as aforesaid and to so purchase Red Rope, to provide and pay the purchase price, all through such misrepresentations, concealments and omissions and all in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the General Rules and Regulations promulgated thereunder.

9. In order to effect the sale of the aforedescribed securities, the aforesaid defendant utilizing instrumentalities of interstate commerce and the mails, employed devices, schemes or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in transactions, practices or courses of business which operated as a fraud and deceit upon the aforesaid plaintiff, all in violation of Section 17(a) of the Securities Act of 1933.[8]

In addition to the factual allegations of the complaint which are apparently undisputed, the following facts which were established by pre-trial discovery, are important to the proper disposition of the instant action.

Becker admits that it sold to Cant from its own account as principal, the following amounts of common stock as of the individual trade dates:

(1) Red Rope, 1,000 shares purchased on November 19, 1968 for an aggregate purchase price of $7,250;

(2) Red Rope, 1,500 shares purchased on December 16, 1968, for an aggregate price of $10,687.50;

(3) Red Rope, 500 shares purchased on March 19, 1969, for an aggregate price of $3,500;

(4) Ranchers, 600 shares purchased on July 18, 1968, for an aggregate price of $26,700;

(5) Ranchers, 200 shares purchased on October 11, 1968, for an aggregate price of $8,500;

(6) Ranchers, 500 shares purchased on June 18, 1969, for an aggregate purchase price of $16,187.-50.[9]

Becker has admitted that each of the above transactions was evidenced by a confirmation slip which was sent to Cant through the United States Mails, on the trade date indicated for each purchase.[10]

means or instrumentality of interstate commerce, or of the mails . . . (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

8. Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), provides:
"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

9. Answer, paragraphs 5, 11, 13, 25, 27, 29; Defendant's Answer No. 1 to Plaintiff's Additional Interrogatories.

10. Answer, paragraphs 6, 11, 13, 27, 29; Affidavit of Daniel O. Birkle, paragraph 5.

For the last 15 years during which Dr. Cant dealt with Becker, the plaintiff's primary contact with that firm was through Robert E. Weiczorowski.[11] As was the practice, Mr. Wieczorowski would call Dr. Cant and suggest certain securities for purchase.[12] On each of the six occasions listed above Dr. Cant was contacted and did purchase the six blocks of securities of Red Rope and Ranchers at the invitations of Mr. Wieczorowski.[13]

Dr. Cant relied on defendant's recommendations and during the entire period of their relationship expressed complete confidence in Becker and especially Mr. Wieczorowski.[14] Mr. Wieczorowski was keenly aware of this relationship of reliance.[15] Dr. Cant rarely went against the defendant's recommendations.[16]

In his deposition Dr. Cant stated that with respect to each of the six transactions he was not informed that defendant was acting as principal.[17] Dr. Cant further testified that he did not learn that Becker was dealing as a principal until approximately the time the instant action was instituted.[18]

11. Robert E. Wieczorowski's deposition, taken August and September 7, 1973, hereinafter referred to as "Wieczorowski Dep.," at pages 11, 12, 19, 20, 22, and 23.

12. Wieczorowski Dep., pages 19, 21, 22 and 24. Cant Dep., page 163.

13. Cant Dep., pages 168, 169, 180, 183, 186, 187, 206, 208, 210, 211, 214, 217, and 220. Wieczorowski Dep., pages 101, 102, 104 and 107.

14. Wieczorowski Dep., pages 25 and 28. Cant Dep., pages 179, 180, 186 and 217.

15. Mr. Wieczorowski, in his deposition, stated:

"Q. When you made recommendations to Dr. Cant, was there generally a great deal or a modest amount or no discussion at all or any variation of it, regarding the particular investment, prior to the determination of Dr. Cant to follow the recommendation?

A. This varied. I had an important concern for Dr. Cant, as I did with all my accounts, but I'd say in his case it was maybe a little more than average account, to be sure that he was advised as to what was happening, and I made, sometimes—this was just a fact—sometimes I had the feeling I almost had to force information on Dr. Cant. He would be busy with his practice or he would, for some reason or other, feel that he had some pressure on him, something was occupying his time, and sometimes the general sense I had was that you had to really work on Dr. Cant to tell him about things."

Furthermore, Dr. Cant's reliance on Mr. Wieczorowski is clearly established:

"Q. I am not sure whether we have gotten to the point where you believed that Dr. Cant placed a great deal of confidence in your recommendations or questioned them or ever rejected them for any reason.

That is a very big question. I would like to break that question down.

May I say that you indicated that you almost had to force information on Dr. Cant for one reason or another, his business, his schedule, or whatever it might be; that he was not receptive to absorbing a great amount of information.

That is my paraphrasing.

A. Let me say the word "force" is not that used in an adversary sense.

We had a very nice relationship. I just mean it took a little extra doing.

Q. What I am trying to determine is, from the moment in time you determined to make a recommendation and you picked up the telephone and you telephoned Dr. Cant, which I presume is the method that was used to communicate with him?

A. That's correct."
Wieczorowski Dep., page 27.

16. Wieczorowski Dep., pages 22, 25, 51 and 52; Cant Dep., pages 161 and 162.

17. Cant Dep., pages 142, 177 and 179.

18. In his deposition, Dr. Cant stated:
"Q. Doctor, when did you first, you personally, first learn that Becker was dealing as principal in this particular transaction?
A. I presume as of now. I can't remember having checked into that within any period previously.
Q. Did you learn at any time prior to the institution of this suit?
A. No.
Q. Doctor, you didn't learn that Becker was dealing as principal, you personally didn't learn prior to the receipt of this document in the mail, is that correct?
A. Within my knowledge, yes.
Q. And you also did not ask anyone at A. G. Becker if they were dealing as principal in connection with this transaction, is that correct?
A. No.

The defendant Becker contends that it disclosed to plaintiff that A. G. Becker was acting as principal by virtue of the confirmation slips sent to Dr. Cant. More specifically at the top right-hand side of the confirmation slip are a number of small boxes with numerals in them. One box is labeled "Exch." and it contains the numeral "9". On the reverse side of the document are the words "Code Symbols" and underneath these words in lettering approximately one-half the size of typewritten print, the word "Exch." appears with nine numerals in a column alongside it. After the numeral "9", the following appears: "for our own account as principal".[19] This document is the only information Cant received from Becker that the defendant was not buying stock for Cant as Cant's agent but instead selling to Cant as a principal the stock which was part of Becker's inventory.

Dr. Cant testified that even if he had read the confirmation slip with its code section the term principal would not have meant anything to him because the defendant never explained the code or the terms to Dr. Cant.[20] Dr. Cant has testified that aside from no one informing him at any time that Becker was acting as principal, even if he had read the confirmation slip he could not have understood the meaning of the descriptive phrase on the confirmation slip and he would have had difficulty finding the relevant coded sections which would disclose the information that defendant was acting as principal.[21]

Mr. Wieczorowski, who Dr. Cant almost exclusively dealt with, was questioned as to whether or not he could recall specifically stating to Dr. Cant that the Red Rope and Ranchers transactions were being engaged in by A. G. Becker as principal.[22] Mr. Wieczorowski was ambivalent as to the possible methods of communicating the concept of dealing from inventory to Dr. Cant and used vague types of terminology as "7¼ net" or "I have available for you" or other similar terminology.[23] Mr. Wieczorow-

Q. Is that correct?
A. Yes.

Q. And they never voluntarily disclosed that information to you orally, is that correct?

A. Within my knowledge, no."
at page 190.

19. See defendant's Exhibit 29–7, 29–8, 29–9, 30–1, 30–2 and 30–3 to the deposition of John F. Cant.

20. See Dr. Cant's deposition, pages 189, 215 and 217. Further Dr. Cant in his deposition stated:

"Q. And prior to receipt of the confirmation or at about the time you received it, you did not ask anyone at Becker if they were trading as principal in this transaction, is that correct?
A. That is correct.

Q. And to your best recollection, no one at Becker told you orally that they were dealing as principal in this transaction, is that correct?
A. To the best of my recollection, yes.
Q. Is it possible that they did, Doctor?
A. I don't believe anybody ever told me that.
Q. You don't recall anybody ever telling you that, is that correct?
A. That they were acting as principal, no.

Q. Yes. You don't recall anybody telling you that orally as opposed to in writing?
A. I do not.
Q. Did they ever disclose the fact to you in any other writings?
A. No.
Q. Doctor, when Mr. Wieczorowski talked to you initiating this transaction, what did you know about Ranchers Exploration and Development Corporation?
A. I did not know of it.
Q. Did you ask Mr. Wieczorowski anything about Ranchers?
A. No, I did not. I had complete confidence in him."
at pages 178–9.

21. Cant Dep., pages 173, 176, 285 and 288.

22. Cant Dep., pages 108 and 110.

23. Wieczorowski Dep., page 109. In fact, Mr. Wieczorowski, in his deposition, testified as follows:

" . . . but if your question is, did I always use the word 'principal', that word, the answer would be probably not."

Further, it appears that Mr. Wieczorowski at one point during his deposition misread the confirmation slips which were marked for identification and interpreted the coded entry improperly (Wieczorowski Dep., pages 133 through 135).

ski also stated in his deposition that he had no recollection of specifically explaining the concept of principal to Dr. Cant.[24]

Mr. Wieczorowski testified that failure to sell securities held in inventory at a greater price than their cost to A. G. Becker resulted in a loss to A. G. Becker which in certain circumstances might be shared by himself.[25]

Both the plaintiff and defendant have agreed that discovery has reduced the instant litigation to the following two issues of law:

1. Whether or not A. G. Becker's disclosure by complying with Rule 15c1–4, 17 C.F.R. § 240.15c1–4, was complete and adequate.

2. Whether or not under all the circumstances of this case A. G. Becker's disclosure was complete and adequate.

I. THE RELEVANT SECURITIES STATUTES AND THE PROBLEM OF DISCLOSURE.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful

". . . for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

*       *       *       *       *       *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, 17 C.F.R. § 240.10b–5, makes it unlawful for any person, directly or indirectly, by use of any of the jurisdictional means set forth in Section 10(b).

"(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

The heart of the instant complaint appears to be the defendant's failure to disclose that it was acting as a principal *at the time of the communication initi-*

---

24. Mr. Wieczorowski, in his deposition, stated:

". . . I can't tell you that I sat down and said, 'Now Dr. Cant, this is what a principal trade is and you have got to know all the details about it' . . . " (Wieczorowski Dep. at page 119).

"Q. So you would have no recollection, then, of specifically going through the concept of principal with Dr. Cant?

. . .

A. Not specifically.

Q. Certainly if you have no specific

. . .

A. . . . you know, I can be self-serving and say that I think I probably did, but I don't know when I did. I don't know if I did or when I did.

Q. It follows you wouldn't know what you did on these three transactions if you don't know it all.

A. What I did on these transactions, as all transactions, is to try to convey whether I was acting as agent or acting as principal. I have no knowledge that on any of these transactions I said what the meaning of principal was or tried to draw it out or explain it to him.

Q. Nor, according to your testimony, do you have any recollection if you used the specific word 'principal', is that correct?

A. No, I do not have any recollection." at pages 119 and 120.

25. See Wieczorowski Dep., pages 76, 77, 84, 150 and 151.

*ated by defendant.* Defendant draws the Court's attention to Section 15(c)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(c)(1), a section which deals with the over-the-counter transactions. This section provides that:

> "No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security . . . otherwise than on a national securities exchange [i. e., in the over-the-counter market], by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent.

In accordance with the mandate of Section 15(c)(1), the Securities and Exchange Commission has promulgated, *inter alia,* Rule 15c1–4, 17 C.F.R. § 240.-15c1–4, entitled "Confirmation of Transactions". This rule sets forth the disclosure required to be given by a broker-dealer to a customer when the broker-dealer sells to the customer an over-the-counter security as a "dealer for his own account". The rule states

> "The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c)(1) . . . is hereby defined to include any act of any broker or dealer designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing (a) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker

for some other person, or as broker for both such customer and some other person . . . ."

Failure of a broker-dealer to make the disclosure required by Rule 15c1–4 has been defined by the Securities and Exchange Commission in Rule 10b–3, 17 C.F.R. § 240.10b–3, to be a manipulative or deceptive device or contrivance within the meaning of Section 10(b).

Defendant contends that by sending the coded confirmation slips, it has complied fully with Rules 15c1–4 and 10b–3 and thus has not engaged in activity which would come within any of Section 10(b) or Rule 10b–5's prohibitions.

## II. EFFECTIVE DISCLOSURE.

■ The keystone of the entire legislative scheme of the securities laws is disclosure.[26] The emphasis on disclosure rests on two considerations. One relates to the proper function of federal government in regulating investment matters. Apart from the prevention of fraud and manipulation, the draftsmen of the 1933 and 1934 Acts viewed that responsibility as being primarily one of seeing to it that investors and speculators had access to enough information to enable them to arrive at their own rational decisions. The other, less direct, rests on the belief that appropriate publicity tends to deter questionable practices and to elevate standards of business conduct. The fundamental purpose of federal security legislation was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry. SEC v. Capital Gains Research Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The focus on disclosure reflects the insight gained by experience that without complete, accurate and intelligible information about a securities transaction investors cannot make intelligent investment decisions.

---

26. See Knause, "A Reappraisal of the Role of Disclosure", 62 Mich.L.Rev. 607 (1964); F. Wheat, Disclosure to Investors (1969).

## III. THE INSTANT ACTION AND THE DISCLOSURE REQUIRED.

■ The spirit of disclosure as required by Section 10(b) of the Securities Exchange Act of 1984 and Rule 10b–5 of the General Rules and Regulations promulgated thereunder and Section 17 of the Securities Act of 1933 is flexible and the antifraud sections are remedial in nature, prophylactic in scope and should be liberally construed to encompass devices that are alien to the climate of fair dealings and full and adequate disclosure. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); SEC v. Capital Gains Research Bureau, *supra*; Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970). These antifraud provisions have been liberally interpreted by the Courts in order to determine under all factual situations whether a material misrepresentation was made or omitted in connection with the sale of a security, and what might constitute such a material fact. Special circumstances and relationships may effect and influence the responsibility for disclosure. For example, Dr. Cant's long and dependent relationship with defendant creates a special circumstance that results in an obligation exceeding the normal duties owing to a casual customer or a customer whose reliance is not as clearly placed with the broker-dealer as in this case. The coverage of the antifraud sections is not limited to those devices or contrivances that were known at the time of enactment, but rather the sections are meant to reach practices employed in connection with purchase or sale of securities contrary to public interest or interest of investors. Herpich v. Wallace, *supra*. The antifraud sections prohibit all fraudulent schemes in connection with the purchase or sale of securities whether or not the artifice employed involves a garden-type variety of fraud or is a unique or subtle form of deception. Carroll v. First National Bank of Lincolnwood, 413 F.2d 353 (7th Cir. 1969), cert. denied, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1969); Ferraioli v. Cantor, 281 F.Supp. 354 (S.D.N.Y.1957); Opper v. Hancock Securities Corp., 250 F.Supp. 668, aff'd, 367 F.2d 157 (2nd Cir. 1966).

■ The issue is whether the defendant failed to communicate a material fact to Dr. Cant. The test of "materiality" to be applied in connection with the antifraud sections is whether a reasonable man would attach importance to the fact not disclosed in determining his choice of action in the transactions in question. Affiliated UTE Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Roger v. Ilikon Corp., 361 F.2d 260 (1st Cir. 1966); SEC v. Texas Gulf Sulpher Co., 401 F.2d 833 (2nd Cir. 1968); Ross v. Licht, 263 F.Supp. 395 (S.D.N.Y.1967).

■ In addition to the responsibility for making disclosures of material facts is the implicit further responsibility of accomplishing this disclosure in a manner that results in the facts being clearly and intelligibly communicated and not obtusely or cryptically communicated. Feit v. Leasco Data Processing Equipment Corporation, 332 F.Supp. 544 (S.D. N.Y.1971).

■ It is clear to this Court that, given the unique and special relationship between the parties, the defendant A. G. Becker breached its affirmative duty to disclose all information concerning the defendant's status as principal and the significance of such a selling posture in the plaintiff's purchase of the securities in question. Further, the defendant's disclosure by means of the confirmation slips was not sufficient given the plaintiff's long standing reliance upon defendant's investment advice, and the failure of Mr. Wieczorowski to inform and educate the plaintiff on the code and the terminology, and the fact that the plaintiff apparently did not under-

stand the code or the terminology or that the defendant was acting as a principal and not a broker.

■ The defendant A. G. Becker predicates its position on the case of Batchelor v. Legg & Company, 52 F.R.D. 553 (D.Md.1971). However, the *Batchelor* case does not involve the same type of special customer relationship and reliance that existed in the instant action. Cf. Chasins v. Smith, Barney & Company, 438 F.2d 1167 (2nd Cir. 1971). This Court is not holding that a broker is liable in every instance where the broker is acting as a principal and this change in status is not expressly, clearly and painstakingly explained to the investor. Rather, this Court is holding that where there is, as in the case at bar, a special relationship of confidence between the investor and broker and the broker fails to adequately and clearly inform or educate the investor as to the change in the broker's status, the broker will be liable because the investor due to this failure to disclose cannot make a properly informed investment decision. It is thus the opinion of this Court that defendant A. G. Becker is liable to the plaintiff Dr. Cant on Count I through Count VI and X through XV of the complaint.

## IV. DAMAGES.

As to the issue of damages it is the desire of this Court that the parties file briefs in support of their respective theories. The parties can supplement the present record with whatever affidavits, exhibits or depositions they consider relevant and necessary.

Accordingly, it is hereby ordered that the defendants are adjudged liable on Counts I, II, III, IV, V, VI, X, XI, XII, XIII, XIV, and XV. It is further ordered that the plaintiff has until April 26, 1974 to file its brief on the issue of damages, the defendant has until May 17, 1974 to answer and the plaintiff has until May 31, 1974 to reply; and that this Court will rule on the issue of damages on June 18, 1974.