**CONGREGATION OF THE PASSION, HOLY CROSS PROVINCE, Plaintiff-Appellant,**

v.

**KIDDER PEABODY & CO., INC., Bankers Trust Company, and Touche Ross & Co., Defendants-Appellees.**

No. 85–2427.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1986.

Decided Sept. 4, 1986.

Thomas P. Ward, Chicago, Ill., for plaintiff-appellant.

Francis J. Higgins, Joe A. Sutherland, Gardner Carton & Douglas, Chicago, Ill., P.B. Konrad Knake, White & Case, New York City, for defendants-appellees.

Before CUMMINGS, Chief Judge, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

This appeal presents three issues. First, whether the appellees, Kidder Peabody & Co., Inc. (Kidder Peabody) and Bankers Trust Company (Bankers Trust), violated section 10(b) of the Securities Exchange Act of 1934 (SEA), 15 U.S.C. § 78j(b), and Securities Exchange Commission (Commission) Rule 10b–5, 17 C.F.R. § 240.10b–5. Second, whether Kidder Peabody, Bankers Trust or Touche Ross & Co. (Touche Ross) aided and abetted in any violation of the statute and the Rule. Third, whether the Congregation of the Passion, Holy Cross Province, (Congregation) is liable for the debt which remained in the accounts maintained on its behalf by Bankers Trust and Kidder Peabody. The district court granted the motions of Kidder Peabody, Bankers Trust and Touche Ross for summary judgment on the securities law violations. It further declined to exercise pendent jurisdiction over the remaining state claims against Touche Ross and dismissed those claims without prejudice. Several months later, it granted summary judgment in favor of Kidder Peabody and Bankers Trust on their counterclaims. We affirm the judgment of the district court.

I

FACTS

The Congregation is a Roman Catholic religious community consisting of priests, brothers and students. To provide for the education of members of the community, the Congregation maintained a "Permanent" fund. The Congregation also established a "Retirement" fund to provide for older members of the community. In 1975, the treasurer of the Congregation, Father Parsons, decided that an investment advisor should manage these funds. While investigating candidates to fill that position, Father Parsons received several excellent letters of recommendation about Cranford Newell. Father Parsons invited Mr. Newell to make a presentation to the Congregation's Provincial Council. With the approval of the Council, on July 28, 1975, the Congregation hired Mr. Newell as the investment manager of its "Retirement" fund. The Congregation gave Mr. Newell "full discretion to develop and implement a

prudent portfolio strategy" for investment of the million dollar fund.[1] R. 309, First Boston Ex. 2. Shortly thereafter, the Congregation also entrusted Mr. Newell with a million dollars from the "Permanent" fund.

Mr. Newell selected a course of investment which included a series of arbitrage transactions.[2] In a letter addressed "To whom it may concern," Father Parsons confirmed Mr. Newell's authority "on a fully discretionary basis, to effect arbitrage transactions (involving 'long' and 'short' positions in fixed income securities) for the accounts of the CONGREGATION OF THE PASSION, HOLY CROSS PROVINCE." R. 309, Kidder Ex. 3. The letter also requested and authorized dealers to accept and execute orders placed on behalf of the Congregation by Mr. Newell. *Id.* Mr. Newell used this authority to make all the investment transactions with the funds entrusted to him by the Congregation. On behalf of the Congregation, Mr. Newell placed orders with over thirty dealers. He would direct the dealer to execute a purchase or sale of a security for the Congregation's account. The dealers never offered Mr. Newell or the Congregation any investment advice. The dealers executed the transactions in accordance with Mr. Newell's instructions. A confirmation slip was sent to Mr. Newell, the Congregation and the Congregation's bank, United California Bank (Bank). The confirmation slip indicated: the transaction number; a trade date; the name of the customer; a description of the security involved; a description of the transaction; the quantity of the security involved; the price; the principal; the interest; and the net amount due. When a transaction earned a profit, the dealers would wire money to the Bank and

when a transaction lost money, the Bank would wire funds to the dealers. Other than the confirmation slips, the dealer had no contact with the Congregation. When Sister Flaherty, who was tracking the transactions for the Congregation, had a question, she called Mr. Newell, not the dealers.

As early as 1976, members of the Business Advisory Board of the Holy Cross Province (Board) expressed some concern not only about the high risk involved in the arbitrage transactions but also about the pressure that the high expectations of return placed on Mr. Newell. R. 309, First Boston Exs. 20, 22, 315, 316, 318, 323. The Board solicited a study of Mr. Newell's investments. An independent firm concluded that Mr. Newell had taken substantial risks in a period of uncertainty in the bond market. R. 309, First Boston Ex. 223.

It was Touche Ross, the Congregation's accounting firm, which ultimately uncovered the extent of the risks Mr. Newell had taken. Beginning in 1973, the Congregation hired Touche Ross to prepare an annual report based on a review of unaudited financial statements. While preparing the 1976 report, Touche Ross consulted with the Congregation and decided to report the arbitrage investments on a cost basis. Each year, a footnote appeared in the report indicating that the arbitrage investments were not reported at current market value; instead, "[o]nly the required margin payments were carried as investments." This accounting method made Mr. Newell's investments appear profitable.

While preparing the 1980 report, however, Touche Ross began to question the location of the $3.6 million balance reported

---

1. The Congregation of the Passion, Holy Cross Province, adopted an "Investment Philosophy and Policy." R. 309, First Boston Ex. 3. The policy established an objective of a twelve to fifteen percent per annum return on the investment. In order to achieve this goal, the policy recommended that "[t]he Manager or Managers, should have a full understanding of our Investment Policy, our objectives and our expectations. Within these limits, once engaged, he should be allowed full discretionary authority and responsibility in managing the funds com-

mitted to him." *Id.* at 4. The policy makes it clear that the manager would have full discretion over investment decisions.

2. Arbitrage has been defined as "[t]he simultaneous purchase in one market and sale in another of a security or commodity in hope of making a profit on price differences in the different markets." Black's Law Dictionary 95 (5th ed. 1979).

by Mr. Newell. Further investigation revealed that the actual market value of the accounts was $2.4 million less than Mr. Newell had reported. Touche Ross disclosed this information to the Congregation in February 1981. Despite this information and the Board's concerns, the Congregation transferred, in April 1981, another $500,000 to Mr. Newell. Finally, on May 6, 1981, the Congregation revoked Mr. Newell's authority to invest its funds and instructed the dealers to close all remaining accounts. By this time, Mr. Newell's investment program had not only completely depleted the $2.5 million entrusted to him but also created large debts in the accounts maintained by the dealers.

The Congregation filed suit against Mr. Newell, several dealers (including Kidder Peabody and Bankers Trust) and Touche Ross. The complaint alleged that Mr. Newell and the dealers had violated section 10(b) of the SEA, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The Congregation also alleged that the dealers and Touche Ross aided and abetted in these violations. Finally, the complaint contained pendent counts alleging common law breach of fiduciary duty, conversion and breach of contract. The dealers responded with counterclaims for the unpaid deficit remaining in the Congregation's accounts.

The district court granted Bankers Trust, Kidder Peabody and Touche Ross' motions for summary judgment. R. 314. The court found that the dealers made no material misrepresentations and owed the Congregation no duty to disclose any information. The district court also found that this court's holding in *O'Brien v. Continental Illinois National Bank and Trust Company,* 593 F.2d 54, 60 (7th Cir.1979), precluded a finding of primary liability under the securities laws since Mr. Newell had full discretion to develop and implement the Congregation's investment policy. R. 315 at 7. Therefore, these defendants had not violated section 10(b) and Rule 10b–5.

The district court also concluded that, because there was no primary violation of the statute or the Rule, these defendants could not have aided or abetted such a violation. Accordingly, the district court dismissed the securities counts against Kidder Peabody, Bankers Trust and Touche Ross and it refused to exercise pendent jurisdiction over the remaining counts. The district court also found that, because Mr. Newell had full discretion to act as the Congregation's agent in arbitrage transactions and because the plaintiff had knowledge of the types of transactions Mr. Newell entered into on its behalf, the dealers were entitled to look to the Congregation for payment of the debt remaining in the accounts. Accordingly, the district court granted the dealers' motion for summary judgment on their counterclaims. R. 347. Finding no just reason for delay, the district court entered final judgment in favor of Kidder Peabody, Bankers Trust and Touche Ross on all issues in both the complaint and the counterclaims.[3] The Congregation has appealed the district court's decisions.

## II

### PRIMARY VIOLATION

The first issue the Congregation raises on appeal is whether Kidder Peabody or Bankers Trust violated section 10(b) of the SEA, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Section 10(b) makes it unlawful for any person to use "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe" in connection with the purchase or sale of any security. Pursuant to section 10(b), the Commission promulgated Rule 10b–5 which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cir-

---

**3.** When the district court granted the appellees' motions for summary judgment, *see* Fed.R. Civ.P. 54(b), several other defendants remained in the case including: Mr. Newell, Newell Associates and Richard Bianchina, one of Mr. Newell's associates.

cumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Although neither the statute nor the Rule expressly creates a private cause of action, the Supreme Court has noted that "a private cause of action for violation of the statute and the Rule is now well established." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). The Congregation alleged that the dealers made misrepresentations and failed to disclose material facts in violation of section 10(b) and Rule 10b–5. For the reasons set forth in the following subsections, we affirm the district court's determination that the dealers did not violate either the statute or the Rule.

a) *Fraud in the Purchase or Sale of Security*

■ Section 10(b) and Rule 10b–5 are directed at fraud "in connection with the purchase or sale" of securities. 17 C.F.R. § 240.10b–5. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975). Therefore, the dealers submit that their conduct cannot be a violation of section 10(b) and Rule 10b–5 unless it was a misrepresentation or nondisclosure which was made to participants in a securities transaction. As this court noted in *O'Brien v. Continental Illinois National Bank and Trust Company*, 593 F.2d 54, 60 (7th Cir. 1979):

[T]he relevant inquiry is whether plaintiffs were denied information that would or might have been useful to them in deciding whether to purchase or sell securities which they actually did purchase or sell.

The important point for our analysis is the decision to which the nondisclosure related. If that decision is whether to purchase or sell a security, the nondisclosure is in connection with the purchase or sale.

In *O'Brien*, we refused to extend the implied cause of action under Rule 10b–5 to a "claim made by persons who have deliberately chosen to delegate the power to make investment decisions that the recipient of the power has misused it." *Id.* at 61. Similarly, in this case, we cannot imply a violation of section 10(b) and Rule 10b–5 when the plaintiff transferred to Mr. Newell full authority to make investment decisions. The Congregation made no investment decisions; it hired Mr. Newell for that purpose. Mr. Newell had "full discretion to develop and implement a prudent portfolio strategy." R. 309, First Boston Ex. 2. Unlike the plaintiffs in *Norris v. Wirtz*, 719 F.2d 256, 259–61 (7th Cir.1983), and *Goodman v. Epstein*, 582 F.2d 388, 412–14 (7th Cir.1978), the Congregation was not required to approve each transaction.

The Congregation did retain the authority to increase or decrease the investment fund and ultimately to dismiss Mr. Newell. However, this authority relates to its relationship with Mr. Newell, not to any particular decision to purchase or sell a security. The federal protection of section 10(b) and Rule 10b–5 does not govern this relationship. Such an extension of federal regulation, especially in the absence of a clear congressional mandate, "would overlap and quite possibly interfere" with traditional state common law governance of such fiduciary relationships. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977). As we said in *O'Brien:*

The decision to which the nondisclosure related was whether plaintiffs should terminate the trust or agency agreements or, perhaps, take some action against Continental. As Judge Flaum correctly stated in his memorandum of decision granting the motions to dismiss the federal claims,

[T]here was no investment decision to be made by plaintiffs and no such decisions were affected by any lack of information on plaintiffs' part. The

"market transactions" were pure; the trust relationships allegedly were not. Rule 10b–5, however, protects the former and not the latter. 593 F.2d at 60.

b) *Misrepresentations*

█ Even if the alleged misrepresentations and nondisclosures occurred "in connection with the purchase or sale of any security," 17 C.F.R. § 240.10b–5, the dealers are entitled to summary judgment. There simply were no misrepresentations made by the defendants to the Congregation.

The Congregation quite candidly admits that "[t]he only contact ever made by any dealer with the plaintiff was in the form of what purported to be confirmations of purchases and sales." Appellant's Br. at 41. However, it argues that these confirmation slips, mailed with each transaction, constituted misrepresentations. The Congregation has not, however, identified any inaccuracies in the information contained in these slips. Rather, it argues that the slips were misleading material misrepresentations because the Congregation's members lacked the sophistication to understand the confirmations. The record casts substantial doubt on the accuracy of that self-characterization by the plaintiff.[4] However, even assuming lack of sophistication on the part of the plaintiff, that fact alone would be insufficient to impose liability on the brokers. The mere fact that the plaintiff was confused does not establish the scienter element of a 10b–5 violation. *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 745 (5th Cir.1984). Liability for this type of alleged misrepresentation, confusing confirmation slips, will only be imposed if the dealers had a special duty to ensure that the customer understood the information. Here, as we discuss more elaborately in the following subsection, the record affirma-

tively, and indisputably, negates a "long and dependent relationship" between the Congregation and the dealers which would create "a special circumstance that results in an obligation exceeding the normal duties owing to a casual customer or a customer whose reliance is not clearly placed with the broker-dealer...." *Cant v. A.G. Beck & Co.*, 374 F.Supp. 36, 46 (N.D.Ill.1974).

c) *Duty to Disclose*

█ Liability under section 10(b) and Rule 10b–5 for failure to disclose depends upon the existence of a duty to disclose. *Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980). This duty arises out of a relationship of trust and confidence between parties to a transaction. *Id.* Under some circumstances, a broker or dealer will have a fiduciary duty to a particular customer. That duty, however, is not based merely on one's status as a dealer. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 15 (2d Cir.1983). A fiduciary relationship arises only when the dealings between the customer and the dealer presuppose a special trust or confidence. Whether or not a fiduciary relationship exists between the dealer and the customer is a question of fact. *Fey v. Walston & Co.*, 493 F.2d 1036, 1049 (7th Cir. 1974); *Avern Trust v. Clarke*, 415 F.2d 1238, 1242 (7th Cir.1969).

█ The Congregation argues that the dealers had a duty to disclose all relevant information, including a duty to inform the customer that its investment advisor was engaging in transactions involving greater risks than a religious organization should accept. The Congregation has alleged that a relationship giving rise to the duty to disclose exists in this case. However, conclusory statements unsupported by specific facts are not sufficient to create a genuine issue of material fact necessary to avoid

---

**4.** While it is not necessary to our decision, we note that there is at least some evidence to indicate that the Congregation could follow the transactions. Sister Flaherty testified that she never made an entry on the ledger unless she was satisfied that confirmation tickets agreed

with cash reports from the United California Bank. Dep.Tr. at 169–70. In addition, the Congregation's Business Advisory Board and an outside firm carefully examined Mr. Newell's investments.

summary judgment. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985).

There is no evidence in the record that the dealers and the Congregation had a special relationship of trust or confidence which would give rise to a duty to disclose. The district court correctly determined that there is no dispute on this record; the Congregation neither sought nor received advice of any kind from the dealers. Indeed, there were no contacts of any kind between the dealers and the Congregation other than the accurate confirmation slips. The dealers never recommended Mr. Newell or reassured the plaintiff about his performance. R. 314 at 4. In short, the dealers acted merely as the instrument for executing the transactions orchestrated by Mr. Newell. This relationship did not create a duty to disclose, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972), or a duty to make sure that the customer understood the confirmations.[5]

The dealers had no duty to disclose information and any failure to disclose did not affect an investment decision. Therefore, the dealers did not violate section 10(b) or Rule 10b–5. Accordingly, the district court correctly granted the dealers' motions for summary judgment on those counts.

### III

### AIDING AND ABETTING

The Congregation also contends that the defendants aided and abetted a violation of section 10(b) and Rule 10b–5. The district judge, in granting summary judgment for the defendants, held that, since there was no primary violation, there could be no aiding and abetting violation. The district judge further held that, even if a primary violation had occurred, there would be, on the uncontroverted facts before him, no liability for aiding and abetting. The broker dealers had merely executed transactions for Mr. Newell. "Even if Newell's conduct was fraudulent, there is no evidence to support the notion that the moving defendants aided and abetted that fraud." R. 315 at 8. With respect to Touche Ross, the district court likewise concluded that there was "no evidentiary basis," *id.*, upon which to premise a securities fraud violation.

■ We have frankly acknowledged that, in light of recent Supreme Court cases,[6] there is some ambiguity about the existence of a civil cause of action for aiding and abetting a section 10(b) and Rule 10b–5 violation.[7] This court has nevertheless held that such a cause of action may be maintained under certain circumstances. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986). We have not, however, had occasion to delineate, in any comprehensive way, the elements of such a cause of action. We need not confront that question today since, under any theory of liability, the district court's judgment must be affirmed. As we have already held, the dealers did not violate the statute or the Rule. Our prior discussion of this court's holding in *O'Brien* also makes it clear that Mr. Newell did not violate section 10(b) or Rule 10b–5. Therefore, there can be no aiding and abetting violation. Moreover, the district court was quite correct in its conclusion that there is no evidentiary basis in

---

**5.** A violation of section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, requires an element of scienter. Negligence is not sufficient, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). At least reckless behavior is required to establish liability under Rule 10b–5. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977). Although the district court did not address the issue, there is no evidence in the record to suggest that the dealers' behavior was reckless or intentional.

**6.** *See Ernst & Ernst*, 425 U.S. at 191 n. 7, 96 S.Ct. at 1380 n. 7; *see also Herman & Maclean v. Huddleston*, 459 U.S. 375, 379 n. 5, 103 S.Ct. 683, 685 n. 5, 74 L.Ed.2d 548 (1983).

**7.** *See SEC v. Holschuh*, 694 F.2d 130, 140 n. 15 (7th Cir.1982); *Sundstrand Corp.*, 553 F.2d at 1044 n. 15.

this record for concluding that the dealers did anything more than execute brokerage transactions at the direction of the Congregation's agent, Mr. Newell. There is no factual basis from which a trier of fact could conclude that the dealers knowingly or even recklessly furthered any fraudulent scheme. Nor, in the absence of any independent affirmative duty, can their silence be the basis of such liability. Similarly, the district court was correct in its conclusion that there was no such basis for liability against Touche Ross.

## IV

### PENDENT CLAIMS

The only remaining counts against the appellees were pendent common law counts. The district court, after properly granting judgment for the defendants on the federal securities fraud counts, did not abuse its discretion by refusing to exercise pendent jurisdiction over the remaining counts. We affirm the district court's decision to grant the defendants' motion for summary judgment.

## V

### COUNTERCLAIMS

■ The Congregation also appeals the district court's decision to grant the dealers' motion for summary judgment on their counterclaims. It argues that Mr. Newell lacked the authority to enter into the type of transactions which created the debts in the Congregation's accounts. The Congregation claims that the risk involved in the type of arbitrage transactions Mr. Newell undertook far exceeded the risk of those authorized. It characterizes the transactions between the dealers and Mr. Newell as unauthorized loans for which it is not responsible. The record does not support the Congregation's arguments. The record

reveals that the Congregation gave Mr. Newell the authority to enter into arbitrage transactions. That authority placed no restriction on the type of arbitrage transactions. Moreover, the record affirmatively shows that the Congregation and its Business Advisory Board were aware of the types of transactions involved and were concerned about the risks associated with these transactions. When it became apparent that the investments were not good risks, rather than revoking Mr. Newell's authority, the Congregation entrusted him with another $500,000 to cover his investments.

The Congregation granted Mr. Newell full authority to enter into these transactions; it was fully aware of the transactions and the type of risks involved. It must now be responsible for the deficit created when the investments lost money. No genuine issue of material fact remains unresolved. Therefore, the dealers are entitled to summary judgment on their counterclaims.[8]

## VI

### CONCLUSION

The district court correctly concluded that, as a matter of law, none of the defendants could be found to have violated section 10(b) or Rule 10b–5. Nor could they be found to have aided and abetted such a violation. Therefore, it properly granted summary judgment for the defendants. The record on summary judgment also establishes, as a matter of law, that the Congregation authorized and was aware of the type of transactions which created the debts in the accounts maintained with the dealers. Therefore, the district court properly granted the dealers' motion for summary judgment on their

8. On appeal, the Congregation has also argued that there is a discrepancy between the dealers' accounts and the Congregation's records. The district court gave the Congregation the opportunity to object to the amount owed. To that point it had not raised an objection other than

the characterization of the transactions as loans. The district court, therefore, accepted the dealers' calculations as correctly reflecting the close out losses. R. 347 at 8. We will not consider an objection not raised in the district court.

counterclaims. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.