David F. BOLGER et al., Plaintiffs,

v.

LAVENTHOL, KREKSTEIN, HORWATH
& HORWATH, et al., Defendants.

No. 73 Civ. 5063.

United States District Court,
S. D. New York.

June 26, 1974.

Reargument July 29, 1974.

Walsh & Frisch, New York City, for plaintiffs; E. Roger Frisch, Robert D. Mercurio, New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for defendants Laventhol, Krekstein, Horwath & Horwath, Landis & Landis, and Morris Landis; Louis A. Craco, Stephen Greiner, New York City, of counsel.

Christy, Frey & Christy, New York City, for defendants Morton Dear and Thomas Martino, Jr.; David P. Steinmann, New York City, of counsel.

METZNER, District Judge:

This is a motion to dismiss the complaint pursuant to Rules 12(b)(1) and (6), Fed.R.Civ.P., for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

Plaintiffs are nineteen limited partners of Takara Partners Limited (Takara), a New York limited partnership which was organized on July 16, 1969, for the purpose of investing and trading in securities. The moving defendants are Laventhol, Krekstein, Horwath & Horwath (Laventhol), an accounting firm which prepared certain financial statements for Takara; Landis & Landis, a New Jersey accounting firm which was part of Laventhol; Morris Landis and Morton Dear, partners in Laventhol and Landis & Landis; and Thomas Mar-

tino, an employee of Laventhol. The remaining defendants are Akiyoshi Yamada and John Galanis, two general partners of Takara who exercised exclusive control over its assets and securities transactions, and Robert Bier and Michael Weiner, two additional employees of Laventhol.

The complaint alleges that Yamada and Galanis violated Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)) (1933 Act), Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) (1934 Act), and Section 206(1) and (2) of the Investment Advisers Act of 1940 (15 U.S.C. § 80b-6(1) and (2)) (Advisers Act) by engaging in a series of illegal transactions on behalf of the partnership designed to defraud the limited partners of Takara.[1] These transactions included, *inter alia*, purchases of over $1 million in "unsuitable securities" for which they privately received cash inducements, misappropriation of Takara's assets, the manipulation of securities in Takara's portfolio for their own benefit, dissemination of false "monthly letters" to the limited partners concerning the value of Takara's assets, and the payment of cash to various accountants for the purpose of securing favorable opinions on Takara's financial condition.

The movants are charged with aiding and abetting these securities law violations as a result of their dissemination in March 1970 of false and misleading certified financial statements (1969 Report), and in April 1971 of materially false and misleading information concerning the investment performance of Takara during 1970 (1970 Income Tax Report). It is unnecessary, for the purpose of deciding this motion, to refer to the specific allegations concerning the actions of the movants.

It is further alleged that as a result of receiving and relying on the 1969 Report and the 1970 Income Tax Report,

1. The complaint also asserts six common law claims for breach of contract, fraud, negligence and breach of fiduciary duty. Jurisdiction as to these claims is grounded on the principles of pendent jurisdiction.

plaintiffs were prevented from learning the true facts about Takara's precarious financial condition. Because of this lack of knowledge they took no steps to recover their investments in Takara, or to prevent further deterioration of its financial status until late May 1971 when Laventhol first disclosed that it could not issue an opinion as to Takara's financial condition, as required by the partnership agreement, for the year ending 1970, because of serious irregularities in its financial records. At that point, plaintiffs acted to save their investments by obtaining an order dissolving Takara. On August 10, 1971, however, the partnership was adjudicated a bankrupt. Plaintiffs now seek damages in the sum of $2,417,641 representing their lost investments.

In the course of these proceedings, plaintiffs have conceded that the Section 17(a) claim contained in Count Two is no longer viable. Consequently, Count Two is dismissed.

We turn then to Count One of the complaint which charges the defendants with violations of Sections 206(1) and (2) of the Advisers Act. These sections provide:

> "It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ."

It is admitted, for the purposes of this motion, that Yamada and Galanis were investment advisers as defined in Section 202(a)(11) of the Act (15 U.S. C. § 80b–2(a)(11)), and that the movants aided and abetted them in committing acts which were violative of these provisions.

Defendants contend, however, that this count must be dismissed because the Advisers Act does not explicitly authorize—nor should the court imply—a private right of action for damages to redress violations of the Act. Although the Advisers Act has been on the legislative rolls for thirty-four years, this is the first time that a court has been called upon to specifically determine whether such a private action may be maintained.[2]

It is undisputed that neither Section 206, nor any other section of the Advisers Act, contains any language which explicitly authorizes a private party to sue for damages for violations of the antifraud provisions of the Act. That factor alone, however, is not dispositive of the instant claim. The Supreme Court has repeatedly recognized that private rights of action may be implied in favor of the intended beneficiaries of an Act in order to enforce compliance with its provisions. *See, e. g.,* J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Texas & Pacific R. R. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916); *cf.,* Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Securities legislation has proved to be no exception. *See generally,* III Loss, Securities Regulation, 932–956 (1961); J. I. Case v. Borak, *supra,* 377 U.S. at 432, 84 S.Ct. 1555.

2. *But see,* Young v. Seaboard Corp., 360 F. Supp. 490, 497 (D.Utah 1973), where the court, without discussion of whether a private right of damages existed, stated that the plaintiff's claims under Section 206(4) of the Advisers Act "appear sufficient to withstand the present motion to dismiss."

Similarly, in Courtland v. Walston & Co., Inc., 340 F.Supp. 1076 (S.D.N.Y.1972), Judge Brieant rendered a judgment after trial, in favor of a plaintiff who had sued under the antifraud provisions of the Advisers Act and the 1934 Act, without indicating which section sustained the damages.

By implying private damage actions in these cases, the courts have in effect legislated interstitially in order to effectuate the broad "remedial purposes" of the federal securities laws. Securities and Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1964).

In determining if a similar private right of action should be implied under the Advisers Act, we must ascertain whether such an implication would be "consistent with the evident legislative intent and, of course, with the effectuation of the purposes intended to be served by the Act." National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); see also, Ash v. Cort, 496 F.2d 416 (3d Cir. 1974). We conclude that it is.

The Advisers Act was the last in a series of federal legislation designed to eliminate certain abuses in the securities industry, abuses which Congress determined had contributed to the 1929 stock market crash and the depression of the 1930's. "A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." Securities and Exchange Commission v. Capital Gains Bureau, Inc., 375 U.S. *supra* at 186, 84 S.Ct. at 280. This Act, along with the Investment Company Act of 1940, was spawned by an exhaustive study and report of investment trusts and investment companies undertaken by the Securities and Exchange Commission pursuant to Section 30 of the Public Utility Holding Company Act of 1935 (15 U.S.C. § 79z–4).

On the basis of this study, Congress determined that persons who paid for investment advice needed protection from dishonest and self-dealing advisers. Thus the Senate Report supporting the enactment of this legislation stated:

"The nature of the functions of investment advisers, their increasing widespread activities, their potential influence on security markets and the dangerous potentialities of stock market tipsters imposing upon unsophisticated investors, convinces this Committee that protection of investors requires the regulation of investment advisers on a national scale." S.Rep. No.1775, 76th Cong., 3d Sess., at 21 (1940).

This view was echoed by the House Report which declared that the Advisers Act was designed to:

". . . protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts and to safeguard honest investment advisers against the stigma of the activities of these individuals by making fraudulent practices by investment advisers unlawful." H.R.Rep.No.2639, 76th Cong., 3d Sess., at 28 (1940).

Based on the foregoing expressions of legislative purpose, it is clear that plaintiffs, as persons who were defrauded out of substantial sums of money by their investment advisers, fall squarely within the class of persons whom the antifraud provisions of Section 206 were intended to protect. *Compare*, Independent Investor Protective League v. Securities and Exchange Commission, 495 F.2d 311, 312 (2d Cir. 1974); Herpich v. Wallace, 430 F.2d 792, 813–16 (5th Cir. 1970). They thus have standing to seek redress for the injuries they allegedly suffered at the hands of the defendants. *See*, Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Moreover, a private right of action for damages in these circumstances is an appropriate vehicle for effectuating Congress' intent in affording protection to these investors. *See*, Chris-Craft Industries, Inc. v. Piper Aircraft, Corp., 480 F.2d 341, 356 (2d Cir.), cert. denied, 414 U.S. 910,

94 S.Ct. 232, 38 L.Ed.2d 148 (1973); Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, 495 F.2d 228, 241 n. 18 (2d Cir. 1974).

Nothing to the contrary is suggested by the Supreme Court's recent opinion in National Railroad Passenger Corp. v. National Association of Railroad Passengers, *supra.* Unlike the Act under consideration there, the legislative history of the Advisers Act does not contain any *affirmative* indication by Congress that a private right of action should be denied, or that enforcement actions by the Securities and Exchange Commission and criminal prosecutions by the Justice Department were intended to be the sole and exclusive remedies available for violations of the Act. *See,* 94 S.Ct. 690.

Despite the foregoing, defendants point to the difference in language in the provision of the Advisers Act granting jurisdiction (Section 214), and similar provisions of the other federal securities laws under which private rights of action have been implied.

Section 214 provides that:

"The district courts of the United States . . . shall have jurisdiction of violations of this subchapter or the rules, regulations, or orders thereunder, and, concurrently with State and Territorial courts, of all suits in equity to enjoin any violation of this subchapter or the rules, regulations, or orders thereunder."

The section goes on to provide venue requirements for criminal proceedings and "actions in equity." Finally, it provides that:

"Judgments and decrees so rendered shall be subject to review as provided in sections 225 and 347 of Title 28, and section 7, as amended, of the Act entitled 'An Act to establish a court of appeals for the District of Columbia', approved February 9, 1893."

Section 22 of the 1933 Act, Section 27 of the 1934 Act, and Section 44 of the Investment Company Act of 1940, have expressly granted the district courts jurisdiction of "all suits in equity *and actions at law* brought to enforce any liability or duty created" by the Acts. (Emphasis added.)

Defendants grasp only at the omission of reference to "actions at law" in Section 214 to sustain their argument that the plaintiffs here may not maintain an action for damages. We disagree.

First, defendants' argument overlooks the language of Section 214 which confers jurisdiction over *"violations"* of the statute and the rules promulgated thereunder. (Emphasis added.) The term "violations" is not limited to criminal proceedings (*see,* Osborne v. Mallory, 86 F.Supp. 869, 979 (S.D.N.Y.1949)). It is therefore broad enough to confer jurisdiction on the district courts for an implied damage action such as the instant suit. *Compare,* J. I. Case, Inc. v. Borak, *supra,* 377 U.S. at 435, 84 S.Ct. 1555.

Secondly, the legislative history of the Act does not contain any support for defendants' proposition. The only references in the Senate and House Reports to Section 214 state that the jurisdictional provisions contained therein are "generally comparable to those of title I," *i. e.,* the Investment Company Act of 1940. Defendants' construction of this section runs afoul of the Second Circuit's repeated admonitions that in construing statutes, especially in the securities field, we should not "be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes." Securities and Exchange Commission v. F. O. Baroff Co., Inc., 497 F.2d 280 at 282 (2d Cir., 1974); International Controls Corp. v. Vesco, 490 F.2d 1334, 1346 (2d Cir.), cert. denied, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *cf.,* Securities and Exchange Commission v. Alan F. Hughes, Inc., 461 F.2d 974, 980 (2d Cir. 1972).

Next, we note that a plausible explanation exists for the hiatus in the language in this statute. Unlike each of

the other securities laws,[3] the Advisers Act does not contain *any* provision *expressly* authorizing a civil action by a private person injured by a violation of one of the provisions of the Act. Accordingly, it was necessary in those statutes to make reference to "actions at law" in the jurisdictional sections. Such a provision was unnecessary in the Advisers Act.

Finally, it is perfectly obvious that the reference in this section to actions in equity to enjoin violations of the statute, rules, etc., refers to actions brought by the Securities and Exchange Commission, since review of judgments and decrees rendered in "actions to enjoin" can only be taken to the Court of Appeals for the District of Columbia. This clearly infers governmental action for enforcement.

Accordingly, the motion to dismiss Count One is denied.

Defendants contend that Count Three, which charges a violation of Section 10(b), must be dismissed because the plaintiffs are neither defrauded purchasers nor sellers.

Under Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L. Ed. 1356 (1951), standing to sue under Section 10(b) is limited to those persons who actually purchase or sell securities. Although the *Birnbaum* rule has been widely criticized by the commentators (*see, e. g.*, Lowenfels, "Demise of Birnbaum Doctrine: A New Era for Rule 10b–5," 54 Va.L.Rev. 268 (1968)), it remains very much the law in this circuit (International Controls Corp. v. Vesco, *supra,* 490 F.2d at 1343, 1346 and n.16), and in every other circuit except the Seventh (Eason v. General Motors Acceptance Corp., 490 F.2d 654 (7th Cir. 1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1979, 40 L.Ed.2d 312 (1974)), which has had occasion to pass on the question.

Plaintiffs claim that they became "sellers," under the *Birnbaum* rule, when they dissolved Takara in May 1971 after Laventhol had disclosed that it could not render an opinion as to Takara's financial condition. They argue that this dissolution constituted an actual "sale of securities," which was directly related to the defendants' prior fraudulent statement about Takara's financial condition.

A determination as to whether *Birnbaum* is satisfied under this theory entails a two-fold inquiry: first, whether the voluntary dissolution of a limited partnership constitutes a "sale of securities" as defined in Section 10(b) and Rule 10b–5; and second, if so, whether the alleged fraud was committed by the defendants "in connection with" this sale.

Plaintiffs rely on Feldberg v. O'Connell, 338 F.Supp. 744, 746 (D. Mass.1972) for an affirmative answer to this first question. The court there held, on strikingly similar facts, that "the conversion of plaintiffs' [limited] partnership interests through [the] dissolution of the partnership into cash would clearly constitute a sale of a security within the meaning of Rule 10b–5." Although this precise question is still open in this circuit (*see,* Fershtman v. Schectman, 450 F.2d 1357, 1360 (2d Cir. 1971)), the Court of Appeals' recent opinion in International Controls Corp. v. Vesco, *supra,* appears to resolve the issue in plaintiffs' favor.

The court in *Vesco* suggested that a flexible approach to the problem of defining "purchases" and "sales" was required in order to fully effectuate the remedial purposes of Section 10(b). Under this standard, the court concluded that a "sale" occurs for *Birnbaum* purposes when there has been a "transaction involving . . . the disposition of securities." 490 F.2d at 1345, 1346,

---

3. Sections 11 and 12 of the 1933 Act (15 U. S.C. §§ 77k, 77*l*) ; Sections 9(e), 16(b), and 18 of the 1934 Act (15 U.S.C. §§ 78i(e), 78p(b), 78r) ; Sections 16(a) and 17(b) of the Public Utility Holding Company Act of 1935 (15 U.S.C. §§ 79p(a), 79q(b)) ; and Section 30(f) of the Investment Company Act of 1940 (15 U.S.C. § 80a–29(f)).

n.16. A corporation's dividend of portfolio stock to its shareholders was therefore deemed to be a "sale" under this definition even though the shareholders paid nothing in return for the stock, and the corporation received nothing. *Id.* at 1346.

■ The parties concede that plaintiffs' limited partnership interests in Takara were "securities." Applying the flexible test enunciated in *Vesco,* the dissolution of the partnership here clearly involved a "disposition of securities" since the limited partners were surrendering their securities in return for what they hoped would be cash. The fact that Takara was insolvent at this time and the limited partners did not recover any cash from the dissolution does not vitiate the nature of the transaction, which was essentially a conversion of securities into cash.

We turn now to the question of whether the "sale" of plaintiffs' partnership interests was "in connection with" the alleged fraud.

Plaintiffs have alleged that extensive misrepresentations by the movants in the 1969 Report and the 1970 Income Tax Report, concerning the valuation and marketability of Takara's portfolio securities, induced them to refrain from taking any steps to liquidate the partnership in 1970 and early 1971 since they believed Takara to be in sound financial condition. They contend that had the true state of Takara's financial affairs been disclosed, they would have sought immediate dissolution. To demonstrate the direct connection between the fraud and subsequent sale, plaintiffs have also alleged that upon discovery of Yamada's and Galanis' fraudulent activities and the movants' concealment thereof, they immediately sought to have the partnership dissolved. As a result of the foregoing allegations, plaintiffs argue that the fraud was directly connected to the dissolution and thus they have satisfied the *Birnbaum* test. Three cases are relied on to support this conclusion: Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965); Travis v. Anthes Imperial Ltd., 473 F.2d 515 (8th Cir. 1973), and Feldberg v. O'Connell, *supra.*

To the extent plaintiffs seek to squeeze themselves within the confines of *Stockwell* and *Travis,* their efforts must fail.

■ The settled law in this circuit is that mere retention of securities and a deferred sale do not satisfy the "in connection with" nexus. *See, e. g.,* Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968); Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967); In re R. Hoe & Co., Inc., CCH Sec.L.Rep. ¶94,552 (S.D.N.Y. May 2, 1974).

■ The crucial factors in *Stockwell* and *Travis* were that the defendants had deliberately and specifically induced plaintiffs to retain their shares by false statements and misrepresentations after plaintiffs had expressly indicated to them a desire to sell the securities. Relying on these allegations, the courts had no difficulty in finding that the deferred sales were directly connected to the earlier fraud, since the essence of the fraud was to have the plaintiffs refrain from disposing of their securities. *See also,* Manor Drug Stores v. Blue Chip Stamps, 492 F.2d 136 (9th Cir. 1974).

In order for *Stockwell* and *Travis* to apply to the instant case plaintiffs would have had to allege that they specifically informed the defendants of their desire to liquidate the partnership *and* that the defendants then induced or encouraged them to retain their partnership interests by fraudulent statements and misrepresentations about Takara's financial condition. No such allegations have been made. As Judge Lord recently observed in In re Penn Central Securities Litigation, 62 F.R.D. 181 at 186 (E.D. Pa., 1974): "The close nexus between a desire to sell, the frustration of that desire by defendant's fraud and an ultimate consummation after discovery of the fraud of the intended sale . . . simply does not exist here." See also,

Ingenito v. Bermec, 376 F.Supp. 1154 at 1177 (S.D.N.Y.1974); In re R. Hoe & Co., Inc., *supra*; cf., Landy v. Federal Deposit Insurance Corporation, 486 F. 2d 139, 155–159 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L. Ed.2d 312 (1974). To the extent that Feldberg v. O'Connell, *supra,* suggests a different result flowing from *Stockwell,* I cannot accept that holding.

Nothing to the contrary is suggested by Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). In order to satisfy the new "touch" test enunciated in *Bankers Life*, for determining if the "in connection with" requirement has been met, the securities transaction must have played some part in the overall fraudulent scheme. The plaintiffs' sale here was not part of the defendants' overall scheme to defraud the limited partners out of their investments. *See*, "The Supreme Court, 1971 Term," 86 Harv.L.Rev. 52, 264 (1972).

In order to fit within the *Birnbaum* rule, plaintiffs have also argued that as limited partners of a partnership formed for the sole purpose of investing in securities, they have the right to maintain a suit under Section 10(b) because of the purchases and sales of the securities made by the general partners for the partnership's portfolio. They claim it would work a grave injustice to deny investors who pooled their capital and entrusted it to the management of fiduciaries to be denied the protection of the securities laws simply "because they chose to effect their purchases and sales of securities through fiduciaries rather than directly." (Pls.' Br. at 33.)

In support of this proposition, plaintiffs rely on a series of cases which have permitted the beneficiary of a trust, from which securities were bought or sold, to sue under Rule 10b–5 for alleged fraud in connection with these transactions. In order to satisfy *Birnbaum*, the courts in these cases have reasoned that, as beneficiaries of a trust, the plaintiffs were the only persons who were actually benefited or harmed by the securities

transactions in question and were thus *de facto* buyers or sellers. *See*, James v. Gerber Products Co., 483 F.2d 944, 949 (6th Cir. 1973); Heyman v. Heyman, 356 F.Supp. 958, 965 (S.D.N.Y.1973).

Plaintiffs claim that as limited partners in a "hedge fund" they are akin to beneficiaries of a trust and should likewise be accorded standing to sue under Rule 10b–5. We disagree.

*Birnbaum* would be completely eviscerated if a person who himself neither bought nor sold securities could be characterized as a purchaser or seller merely because of his relationship to the *actual* purchaser or seller. If such were the rule, any shareholder in a mutual fund, for example, could presumably bring a suit under Section 10(b) for fraudulent mismanagement, and ground his standing on the basis of the securities transactions undertaken in the fund's portfolio. While the terms "purchase" and "sale" have been judicially expanded well beyond their literal terms, no court has yet sanctioned such a broad reading of the standing requirement, and I decline to do so on the facts of this case. *Cf.*, Landy v. Federal Deposit Insurance Corp., *supra*, 486 F.2d at 153–159; Ingenito v. Bermec, *supra*, 376 F.Supp. at 1174.

The motion to dismiss Count Three is granted.

So ordered.

### ON MOTION FOR REARGUMENT

Several of the accountant-defendants have moved for reargument of the denial of their motion to dismiss Count One of the complaint. The motion for reargument is granted.

The basis for this motion is a recent, unreported decision of Judge Eaton in Greenspan v. Del Toro, 73–638–Civ. (S.D.Fla., May 17, 1974), which held that there was no implied right of action for damages under the Advisers Act. To the extent that the decision in *Greenspan* is contrary to the result

reached in this case, I respectfully decline to follow its holding and adhere to my original determination.

Defendants have also urged that even if a private action for damages may be maintained under the Advisers Act, such an action may not be brought against persons like themselves, who are alleged to be only aiders and abettors. In support of this proposition they rely on the difference in language between the antifraud provisions of the Advisers Act and the 1934 Act. Section 206 of the Advisers Act states that "[i]t shall be unlawful for any *investment adviser*" to commit any fraudulent act, whereas Section 10(b) states that "[i]t shall be unlawful for *any person*" to act in violation of that section. (Emphasis added.) Defendants argue that the specific language in the Advisers Act is supposed to restrict its applicability only to investment advisers. We disagree. Such a pedantic and technical reading of the statute (*cf.*, Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034 (2d Cir. 1974)), is inconsistent not only with the Act's patent legislative intent, but also with the remedial purposes of the doctrine of implied remedies, which we previously discussed in the opinion denying defendants' original motion to dismiss. *Cf.* Securities and Exchange Commission v. Baroff, *supra*.

It is now well settled that accountants who aid and abet others in violating the antifraud provisions of the securities laws may be held jointly liable with such persons in private actions for damages. *See generally*, Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto Indemnification and Contribution," 120 U.Pa,L.Rev. 597 (1972). In this regard, the fraudulent activities of the accountant-defendants in this suit were inexorably intertwined with the fraud being perpetrated against the limited partners by Takara's investment advisers. To deny to these investors, who were injured by this combined fraudulent conduct, a cause of action against all of the wrongdoers would leave the plaintiffs with half a remedy and would run afoul of the Supreme Court's repeated admonition that the securities laws are to be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., *supra*, 375 U.S. at 195, 84 S.Ct. at 285, 11 L.Ed.2d 237.

Even assuming *arguendo*, that aiders and abettors may not be sued under Section 206, dismissal is not warranted inasmuch as the common law claims asserted against the accountant-defendants are properly pendent to the viable federal claims against Yamada and Galanis in the complaint. Under the Second Circuit's expansive reading of the doctrine of pendent jurisdiction, joinder of pendent claims involving persons not party to the jurisdiction-conferring claim is permissible when these claims arise out of a common core of facts, as they unquestionably do in the instant case. *See* Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974); Almenares v. Wyman, 453 F.2d 1075 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); Leather's Best Inc. v. S. S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971); Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627 (2d Cir. 1971); *see also*, Note, Federal Pendent Subject Matter Jurisdiction—The Doctrine of United Mine Workers v. Gibbs Extended to Persons Not Party to the Jurisdiction-Conferring Claim, 73 Colum.L.Rev. 153 (1973).

Accordingly, upon reargument, the original determination is adhered to.

So ordered.