Louise Price PARSONS, Plaintiff,

v.

HORNBLOWER & WEEKS–HEMPHILL, NOYES, a partnership, Howard E. Buhse, Charles L. Morse, Jr., Jansen Noyes, Jr., William J. Lawlor, Jr., William G. Maloney, George T. Flynn, Blancke Noyes, Walker W. Stevenson, Jr., Clifton P. Walker, James F. Gilbert, Robert R. Miller, Ralph L. Pope, Jr., Robert W. Sharer, George N. Morris, Henry Hornblower, II, Ralph Hornblower, Jr., Harold F. Carter, Joseph A. Gimma, Robert R. Spence, Hatfield Smith, Dudley H. Bradlee, II, Eugene M. Matalene, J. Malcolm De Sieyes, Edmund T. Anderson, Herman H. Kuver, Stephen C. Reynolds, Jr., Clifford Hemphill, Jr., Richard A. Miller, John F. Detmer, Thor W. Kolle, Jr., Pearce D. Smith, A. Paul Ogilvie, Jr., Jack P. Gould, Royal G. Whiting, C. Austin Barker, Joseph R. Carson, Milton J. Rusnak, Robert M. Wohlforth, James M. Clark, Elmer I. Paull, Henry F. Williams, Stephen J. Kozeletz, John P. Toolan, John T. Schriver, James F. Clardy, William G. Budinger, Salvatore Saladini, Donald O. Von Wedel, Stephen Litte, Alfred Lisi, Earl Rubin, William J. Pigott, Robert J. Florentino, G. Lloyd Isaacs, Richard W. Massey, Bernard N. Klein, Robert M. Biggar, Theodore M. Johnson, William J. Lawlor, III, Peter J. De Angelis, George R. Ross, Bernadotte P. Lester, Jr., Don-

---

ald F. Grannis, Frank E. Dominach, Jr., Joseph J. Ignazio, Richard T. Le Doux, Hornblower & Weeks–Hemphill, Noyes, Inc., Avco Corporation, and Thomas Ward, Defendants.

No. C–74–366–G.

United States District Court, M. D. North Carolina, Greensboro Division.

Feb. 10, 1977.

Lindsay R. Davis, Jr. and Edward L. Murrelle, of Jordan, Wright, Nichols, Caffrey & Hill, Greensboro, N. C., for plaintiff.

Charles F. Vance, Jr., of Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., for defendant Avco Corp.

Beverly C. Moore and Larry B. Sitton, of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for all other defendants.

## MEMORANDUM OPINION

HIRAM H. WARD, District Judge.

This action arises out of plaintiff's purchase of 50,000 shares of common stock of Cartridge Television, Inc., (Cartridge) on

January 20, 1972, for a total purchase price of $1,983,125. Plaintiff alleges that, in connection with that purchase, numerous violations of the federal securities laws were committed by the defendants. Plaintiff prays for recovery of the purchase price and for punitive damages.

Defendants have moved for summary judgment on the ground that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

Prior to July 1971 Cartridge was privately owned, with defendant Avco Corporation (Avco) owning a majority interest. With the financial and technical assistance of Avco, Cartridge had developed a color video tape cartridge system intended primarily for home use.

In July 1971 Cartridge offered for sale to the public 1,100,000 shares of its common stock. Defendant Hornblower & Weeks–Hemphill, Noyes (Hornblower)[1] acted as principal underwriter of the public offering and therefore participated in the preparation of the preliminary and final prospectuses distributed in connection with the public offering. The final prospectus was dated July 13, 1971.

All of the Cartridge stock offered in the public offering was sold by the end of July 1971 and thus Hornblower did not act as an underwriter in connection with the sale of such stock after July 1971. Hornblower did act as a market maker in Cartridge stock during the period from July 1971 to January 20, 1972, and thereafter.

Plaintiff had maintained a cash account with Hornblower for a number of years prior to the transaction at issue. Buy and sell orders were executed in that account by defendant B. Thomas Ward (Ward), a registered representative in Hornblower's Greensboro, North Carolina, office.

Plaintiff had authorized her then husband, Young M. Smith, Jr., (Smith) to buy and sell securities for her account with Hornblower. Each of the transactions described below was effected by Smith in plaintiff's account with Hornblower.[2]

Smith first learned about Cartridge in June or July 1971 when Ward mentioned the company and stated that it was a "speculative, second-stage venture capital situation." After reviewing a copy of one of the preliminary prospectuses and discussing the matter with Ward, Smith decided to buy 3,000 shares for plaintiff's account in the July 1971 public offering at the offering price of $20 per share. This purchase was made in plaintiff's account on July 13, 1971, for the net amount of $60,000. In connection with the purchase, a copy of Cartridge's final prospectus dated July 13, 1971, was mailed to plaintiff and was delivered to Smith.

In December 1971 Smith decided to purchase 10,000 additional shares of Cartridge because it appeared to him, from discussions with Ward and from the stock's prior price movement, that the price of the stock was depressed. The purchase was made in plaintiff's account on December 10, 1971, at a price of $24.25 per share; the total amount paid was $242,500.

By January 18, 1972, the price of Cartridge stock had increased substantially. Ward contacted Smith and suggested that, in view of the rapid increase in the price of the stock during the prior six weeks, Smith might want to consider selling the stock. Smith instructed Ward to sell the 13,000 shares of Cartridge in plaintiff's account, and the sale was executed on January 18, 1972, at a price of $35 per share. The sale yielded $454,480. Since the 13,000 shares had cost $302,500, a total profit of $151,980 was realized. For the 10,000 shares purchased in December 1971 this represented a 44% return on investment and a profit of $107,500.

---

1. Hornblower is a registered broker-dealer and is engaged in the business of buying and selling securities for the accounts of its customers and other related activities. Hornblower was a partnership until September 1972 at which time defendant Hornblower & Weeks–Hemp-

hill, Noyes, Inc., was incorporated under the laws of Delaware.

2. See Affidavit of Young M. Smith, Jr., September 3, 1975.

Two days later, on January 20, 1972, Ward again contacted Smith and reported he had information which had not been available to him on January 18. Ward told Smith that Sears, Roebuck and Co. was about to announce the beginning of its marketing campaign for Cartridge's video tape cartridge system with a two-page advertisement in the *Chicago Tribune*.[3] Although Smith had previously been aware of Sears' intention to market the Cartridge system, the January 1972 announcement was the first public indication that the marketing campaign was ready to begin. Smith concluded that the announcement might result in more widespread enthusiasm and awareness about Cartridge's prospects, which might in turn result in a rapid increase in the price of Cartridge stock.

As of January 20, 1972, plaintiff was experiencing serious cash flow problems in connection with certain real estate development ventures in which she and Smith were involved.[4] A large amount of cash was needed to make a mortgage payment due in May 1972.

Based upon his belief that Sears' anticipated announcement might result in a substantial short term increase in the price of Cartridge stock and upon the hope that such a result would provide plaintiff with additional cash to help meet the mortgage payment due in May, Smith decided to purchase for plaintiff's account 50,000 shares of Cartridge stock. The decision to purchase the 50,000 shares of Cartridge stock was totally that of Smith, plaintiff's agent.[5] The purchase was made in plaintiff's account with Hornblower on January 20, 1972, at a cost of $1,983,125.

Unfortunately Smith's hope was not realized; the gamble did not pay off. The price of Cartridge stock did not rise rapidly. During subsequent months the Cartridge system did not achieve widespread consumer acceptance. By mid-December 1972, Cartridge's inventory was such that it ordered a halt in the production of video tape decks. On June 30, 1973, Cartridge decided to file for bankruptcy under Chapter XI of the Federal Bankruptcy Act. The 50,000 shares of Cartridge stock purchased for plaintiff's account on January 20, 1972, are now worthless.

## NATURE OF PLAINTIFF'S CLAIMS

Plaintiff has alleged that (1) her purchase of 50,000 shares of common stock of Cartridge Television, Inc., on January 20, 1972, resulted from a concerted sales campaign directed by Hornblower and carried out by its agent Ward; (2) the campaign was based upon outright misrepresentation of certain facts and the failure to relate other known, relevant facts; (3) the purchase was not suitable for her account in view of the amount of money involved and the nature of the stock; (4) she was induced to hold the shares by a constant flow of favorable, untrue, and misleading information about Cartridge; and (5) the shares are now worthless.

Plaintiff asserts that she is entitled to relief under Sections 11, 12, and 17 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77*l*, and 77q); Sections 10 and 15 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j and 78*o*) and rules promulgated thereunder, including Rule 10b–5 (17 C.F.R. § 240.10b–5); Section 206 of the Investment Advisers Act (15 U.S.C. § 80b–6); Regulation T of the Board of Governors of the Federal Reserve System (12 C.F.R. § 220); and the Rules of Fair Practice of the National Association of Securities Dealers (NASD).

In addition, plaintiff alleges that Avco conspired with Hornblower in committing the alleged violations summarized above and, further, that such alleged violations were committed willfully and in wanton

---

**3.** This advertisement did appear in the Sunday, January 23, 1972, edition of the Chicago Tribune.

**4.** These problems were not disclosed to Ward or any other representative of Hornblower.

*See* Affidavit of B. Thomas Ward, September 4, 1975.

**5.** *See* Affidavit of Young M. Smith, Jr., para. 15.

disregard of plaintiff's rights so that plaintiff is entitled to recover punitive damages.

## MOTION FOR SUMMARY JUDGMENT

On September 9, 1975, Hornblower and Ward moved for summary judgment. Plaintiff secured two extensions of time to respond to the motion. Before responding, plaintiff engaged in extensive discovery. Thirteen depositions were taken (in Greensboro and Hickory, North Carolina, New York, Chicago, and Washington) consuming twenty-one days and resulting in almost 1900 pages of transcript and over 700 deposition exhibits, many with multiple pages. On August 6, 1976, Avco moved for summary judgment.

The Court fully realizes that summary judgment is not a device to dispose of factual disputes. However, if a motion for summary judgment reveals that there is no genuine issue as to any material fact, then summary judgment is appropriate even in cases that, at first blush, appear to involve complex factual and legal issues. *See First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The United States Court of Appeals for the Fourth Circuit has described the function of summary judgment as follows:

> [T]he function of a motion for summary judgment is to smoke out if there is any case, i. e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.
>
> *Bland v. Norfolk & Southern Ry. Co.*, 406 F.2d 863, 866 (4th Cir. 1969).

The briefs, affidavits, and other materials filed by the parties in connection with the present motions have served this function.

After a cautious and thorough review of the file, and considering the facts in the light most favorable to the plaintiff, the Court is of the opinion that summary judgment is appropriate. Some of the plaintiff's allegations can provide no relief as a matter of law, and the remaining allegations fail to present a genuine issue of material fact requiring submission to a jury.

## DISCUSSION OF THE ISSUES

Several of plaintiff's allegations can be disposed of without extended discussion.

### Inducement to Hold

Plaintiff's allegation that she was induced to hold the 50,000 shares of Cartridge stock purchased on January 20, 1972, by a constant flow of favorable but untrue and misleading information fails to state a claim for relief. Under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), only claims based on misrepresentations or omissions made in connection with a purchase or sale of securities are actionable under the federal securities laws. An inducement not to purchase or sell is not actionable.

In *Blue Chip*, the Supreme Court approved the so-called *Birnbaum* rule (*see Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)), which holds that only actual purchasers and sellers of securities may bring an action under the federal securities laws. The Court noted that among those potential plaintiffs barred by the *Birnbaum* rule are "actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." ·421 U.S. at 737–38, 95 S.Ct. at 1926. It is, therefore, clear that plaintiff's inducement to hold allegations are barred by the *Birnbaum* rule.

### Investment Advisers Act

Without reaching the question of whether a private right of action exists under the Investment Advisers Act,[6] the

---

**6.** *Compare Gammage v. Roberts, Scott & Co., Inc.*, CCH Fed.Sec.L.Rep. ¶ 94,761 (S.D.Cal. 1974), and *Greenspan v. Eugene Campos Del Toro*, CCH Fed.Sec.L.Rep. ¶ 95,488 (S.D.Fla.

undisputed facts are that neither Hornblower nor Ward acted as an "investment adviser" [7] to plaintiff or plaintiff's agent in connection with (or at any time prior to) the January 20, 1972, purchase. Hornblower and Ward presented an affidavit clearly showing that its services to plaintiff did not make them subject to the provisions of the Investment Advisers Act.[8] Plaintiff failed to respond. Under Rule 56(e) of the Federal Rules of Civil Procedure, plaintiff cannot rest on mere allegations in her Complaint but must set forth specific facts showing that there is a genuine issue for trial. Having failed to do so, plaintiff's claims based on the Investment Advisers Act are dismissed.

### Regulation T

Similarly, plaintiff's claims based on Regulation T are dismissed because of plaintiff's failure to respond to Hornblower's and Ward's affidavits, which show that plaintiff's account with Hornblower was a cash account (not a margin account as alleged by plaintiff) and that Hornblower fully complied with the provisions of Regulation T in connection with plaintiff's January 20, 1972, purchase.[9]

### Affirmative Misrepresentations

Plaintiff alleged in her Complaint that, during the period July 1971 through January 1972, Ward made various false and misleading statements to Smith concerning Cartridge and its stock. Specifically the plaintiff alleged that the following misrepresentations were made to Smith by Ward: (1) that Cartridge enjoyed a three-to-four year advantage over its competitors in terms of development of a marketable system; (2) that Cartridge would be able to begin production of its system within the very near future; (3) that Cartridge was financially sound due to the support of Avco; (4) that the market price of the stock would decline and then advance ten to fifteen points in the next two to three months and that the market price was likely to exceed $100 per share within one and one-half years; (5) that the prices of the Cartridge stock purchased were "at the market" or that said prices were related to the market price; (6) that an agent, employee, and registered representative of Hornblower made predictions on future prices of Cartridge stock; (7) that an agent, employee and registered representative of Hornblower stated his intention to invest heavily in Cartridge stock; and (8) that an agent, employee and representative of Hornblower referred to Cartridge's three-to-four year "jump" on competitors in the field. Smith's affidavit and deposition testimony, which were not challenged by plaintiff, completely refute plaintiff's allegations as to Ward and establish that there was no factual basis for such allegations.[10] Plaintiff's claims based upon alleged misrepresentations by Ward are dismissed.

### Section 11 of the Securities Act of 1933

■ In plaintiff's response to the motion for summary judgment, she suggests that her claims are based in part on Section 11 of the Securities Act of 1933 (15 U.S.C. § 77k).[11] Section 11 relates to registration statements containing an untrue statement of a material fact or omitting to state a material fact *at the time such registration statement became effective.* The only registration statement referred to by plaintiff in her response was filed in connection with the public offering of common stock of Car-

---

1974), *with Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260 (S.D.N.Y.1974).

7. As defined in Section 202(a)(11) of the Investment Advisers Act (15 U.S.C. § 80b–2(a)(11)).

8. *See* Affidavit of B. Thomas Ward, September 4, 1975, paras. 4, 5.

9. *See* Affidavit of B. Thomas Ward, September 4, 1975, para. 3; Affidavit of George Jones,

August 20, 1975; and Affidavit of Vincent Fay, May 27, 1975.

10. *See* Affidavit of Young M. Smith, Jr., September 3, 1975, para. 18.

11. Section 11 is not referred to in the Complaint or Amended Complaint as a basis for plaintiff's claims.

tridge Television, Inc., in July 1971. It is undisputed that the registration statement became effective, and Cartridge's common stock was offered to the public, on July 13, 1971. Plaintiff's Complaint was filed on November 20, 1974. As a result, Section 13 of the Securities Act of 1933 (15 U.S.C. § 77m) makes clear that any claim plaintiff might have had under Section 11 by reason of Cartridge's registration statement is barred by the statute of limitations. In pertinent part, Section 13 provides:

> In no event shall any such action be brought to enforce a liability created under section 77k [section 11] or 77*l*(1) [section 12(1)] of this title more than three years after the security was bona fide offered to the public . . ..

Plaintiff's claims based upon Section 11 of the Securities Act of 1933 are dismissed.

Remaining for discussion are plaintiff's allegations (1) that, prior to the January 20, 1972, purchase, Hornblower failed to disclose certain material facts of which it had knowledge and (2) that the January 20, 1972, purchase was not suitable for plaintiff and Hornblower's participation in the transaction constituted a violation of the NASD Rules of Fair Practice.

*Alleged Omissions*

Plaintiff alleges that the following disclosures should have been made prior to or in connection with the January 20, 1972, purchase:

1. A private report prepared by Stanford Research Institute in 1968 for a third party unrelated to Cartridge or Hornblower had reached negative conclusions concerning consumer demand for an acceptance of video tape recorders;

2. Cartridge would have no control over the retail price of its Cartrivision system;

3. Cartridge would need additional financing;

4. No pre-production consumer test of the tape cassette had been undertaken, even though a consulting firm retained by Hornblower had suggested such a test;

5. No "state of the art" patent search was made to determine Cartridge's patent position and its exposure to patent claims asserted by others;

6. Cartridge could go bankrupt;

7. Cartrivision's capability of making home movies was limited because the movie camera could record only if attached to the system's television set; and

8. Hornblower was acting as a dealer in connection with the January 20, 1972, purchase.[12]

At the outset, it is important to identify the kind of omissions that will give rise to liability under the federal securities law. The language of the various statutory sections and rules on which plaintiff relies[13] is virtually identical: liability arises when a person or a communication "omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which [it was] made, not misleading . . .."

■ In short, an omission is not actionable unless it is a material fact that is omitted and unless that material fact adversely affects the reliability of other statements.

■ A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in reaching an investment decision. In *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), a case involving alleged material omissions in connection with a proxy solicitation, the Supreme Court warned that

> if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or mis-

---

**12.** These alleged omissions form the basis for plaintiff's antifraud claims as well as for her so-called prospectus claims.

**13.** Sections 11, 12, and 17 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77*l*, and 77q); Sec-

tions 10 and 15 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j and 78*o*) and rules promulgated thereunder, including Rule 10b–5 (17 C.F.R. § 240.10b–5).

statements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholder in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking. Precisely these dangers are presented, we think, by the definition of a material fact adopted by the Court of Appeals in this case—a fact which a reasonable shareholder *might* consider important.

In view of these dangers, the Court adopted the following standard of materiality: [A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it is important . . ." *Id.*

In addition to being a material fact, an alleged omission must make other · statements false or misleading. In *Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971), stockholders brought suit against corporate officers and others alleging, among other things, that omissions from certain prospectuses fraudulently induced their purchases of stock. The court dismissed the omission claims and held:

> We find nothing in Rule 10b–5 that purports to impose liability on anyone whose conduct consists solely of inaction. On the contrary, the only subsection that has any reference to an omission, as distinguished from affirmative action, is subsection (2) providing that it is unlawful "to omit to state a material fact necessary in order to make the statements made * * * not misleading," *i. e.*, an omission occurring as part of an affirmative statement. [Citations omitted.] We perceive no reason, consonant with the congressional purpose in enacting the Securities and Exchange Act of 1934, thus to expand Rule 10b–5 liability. [Citations omitted.]

437 F.2d at 283.

*See also Landy v. Federal Deposit Insurance Corporation*, 486 F.2d 139, 162 (3rd Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), and *Ash v. Brunswick Corp.*, 405 F.Supp. 234, 245 (D.Del.1975).

As discussed below, plaintiff has failed to come forward with any evidence to show that Hornblower omitted to disclose material facts. Furthermore, plaintiff has failed to identify any statement that was made misleading by reason of any of the alleged omissions listed above.

Plaintiff contends that the first seven alleged omissions listed above should have been disclosed in the Cartridge prospectus dated July 13, 1971. Hornblower correctly points out that the January 20, 1972, sale was not made "by means of" the prospectus [14] and, therefore, the prospectus itself is not at issue. Nevertheless, a review of the prospectus is appropriate to establish the background of information with which the plaintiff must be charged in this transaction.

First, there is no evidence that the prospectus contained any affirmative misrepresentations.

Second, the prospectus stated on the front cover that "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK" and beginning on page 2 listed twelve "RISK FACTORS" which "a prospective investor should carefully consider." The prospectus warned that Cartridge was a highly speculative venture, had never generated a dollar in revenue, and had a present debt of close to $1,000,000. The prospectus further clearly indicated that a portion of the money received from the stock distribution would be utilized to repay debts owed to Avco Corporation, that a Hornblower representative would in all likelihood serve on the board of directors of Cartridge, and that the book value of the stock at the time of the issue would be approximately fifty percent of the purchase price. The prospectus is so honest, ·gloomy, and patently not misleading that it should cause one who is familiar with its contents to be very skeptical of any street talk or puffing to the contrary.

█ Third, plaintiff is chargeable with knowledge of the information contained in

14. See Section 12 of the Securities Act of 1933 (15 U.S.C. § 77*l*).

the prospectus, since Smith received and reviewed the prospectus. *See Spielman v. General Host Corp.*, 402 F.Supp. 190, 195 (S.D.N.Y.1975), *aff'd*, 538 F.2d 39 (2d Cir. 1976):

> A defendant may not be faulted for failure to repeat material information which has been publicly proclaimed in various ways on other occasions. The adequacy of disclosure of material information must be evaluated by a consideration of the "total mix" of all information conveyed or available to investors.

After reviewing each of the alleged omissions in light of the prospectus, the Court is of the opinion that the alleged omissions are either immaterial or not omissions, as a matter of law.

██ The failure to disclose the necessity for a cord between the television and the camera is immaterial as a matter of law. There is no evidence that the need for an "umbilical cord" would be considered important by a reasonable investor. Operating details of this kind constitute trivial information—the very type of trivial information condemned in *TSC Industries, Inc. v. Northway, Inc., supra*, as not conducive to informed decision making.

In the case of other alleged omissions such as those relating to consumer acceptance of Cartridge's product, Cartridge's lack of control over pricing, and its financial condition, the prospectus fairly and fully discloses the pertinent facts. No statement made by or on behalf of Hornblower, in the prospectus or otherwise, is made misleading by reason of the omitted items referred to by plaintiff.

The Court will discuss three of the alleged omissions in detail to illustrate the failure of plaintiff to rebut defendants' affidavits and discovery evidence with specific facts showing that there is a genuine issue for trial.

### 1. *Stanford Report*

Plaintiff asserts that the failure of Hornblower to reveal the existence and conclusions of the Stanford Report prior to the January 20, 1972, purchase "stands out as perhaps the most glaring omission."

The fundamental question raised by the Stanford Report was whether color video tape recorders would meet with general public acceptance.

Although the Stanford Report was not mentioned by name in the Cartridge prospectus, the question of public acceptance of video tape recorders was plainly raised:

### RISK FACTORS

The common stock of the company offered hereby involves a high degree of risk. In evaluating these securities, a prospective investor should carefully consider the following factors:

. . . . .

> 4. To date, commercial application of video tape systems manufactured by others has been limited primarily to industrial and business uses. In view of the novelty of the home video tape system developed by the Company, the substantial estimated retail prices of CARTRIVISION units and cartridges, and the difficulty of predicting public demand for the programming which will be available for use with the system, no assurance can be given that the CARTRIVISION system will meet with general public acceptance.

(Prospectus, pp. 2, 3).

In addition to the prospectus, the record establishes that Smith was aware of the question of public acceptance of the Cartridge system when he purchased 50,000 shares of Cartridge stock for plaintiff's account on January 20, 1972:

Q (Plaintiff's counsel) Tell us all of the problems that Mr. Ward did communicate to you, if any, between July 13, 1971, and January 20, 1972, in regard to Cartridge Television.

A (Smith) Well, that's a very broad question. There was continuing discussion and concern on his part and on mine that we talked about frequently in terms of the ultimate market acceptance of the product. Critical question, big if, what happens and how long does it take to

establish this product—will it take to establish it in the marketplace.[15]

The cautionary language of the prospectus together with Smith's testimony remove any issue of fact as to whether the fundamental question raised by the Stanford Report was disclosed.[16]

### 2. *Patent Position*

Plaintiff's assertion that Hornblower failed to make appropriate disclosures concerning Cartridge's patent position and its exposure to patent claims is equally without merit. "State of the art" investigations had been conducted which revealed that Cartridge had no fundamental patent protection and that patents owned by third parties could be asserted against the Cartrivision system. This uncertain patent position was pointed out in the prospectus.

### RISK FACTORS

. . . . . .

10. Although the Company has filed a number of patent applications pertaining to various aspects of the CARTRIVISION system, it does not expect to obtain fundamental patent protection for the basic concept or design of its system. No assurance can be given that patent infringement claims will not be asserted which may adversely affect the Company or that any valid patent protection will be obtained by the Company. The Company may be required to obtain patent licenses in order to produce and market the CARTRIVISION system, but no assurance can be given that such licenses can be obtained.

(Prospectus, pp. 3, 4).

### HISTORY AND BUSINESS
Patents and Trademarks

. . . . .

There can, however, be no assurance that patents will issue on the Company's patent applications or on any application it

files in the future or that patents issued to the Company will be enforceable, if litigated, nor does the Company believe that it has established a unique proprietary position.

Messrs. Townsend and Townsend do not know of any clearly valid adversary United States patents which can successfully be asserted against the Company's presently proposed recorder-playback unit and cartridge, although the prior art in the field discloses a number of patents which relate in varying degrees to the CARTRIVISION system and adversary claims could be made at any time by competitors of the Company.

A United States patent relating to a type of frequency modulation recording has been called to the Company's attention by a substantial United States patent owner in view of the proposed use of frequency modulation recording in the CARTRIVISION system. The validity of this patent has never been adjudicated. (Prospectus, p. 11).

It is clear from the prospectus that prior art existed in the field which might result in patent litigation. Additional "state of the art" investigations could not have prevented the patent litigation which was instituted in mid-1972. Moreover, this litigation resulted only in a royalty arrangement which was to be paid from future sales.

Plaintiff's contention that material information regarding Cartridge's patent position was omitted is frivolous in light of the explicit statements in the prospectus.

### 3. *Dealer Status Disclosed*

■ Also without merit is plaintiff's assertion that Hornblower failed to disclose that it was acting as a dealer rather than a broker in connection with the January 20, 1972, transaction. It is undisputed that on

---

**15.** *See* Deposition of Young M. Smith, Jr., May 18, 1976, pages 83–84.

**16.** During oral argument, counsel for plaintiff suggested that Hornblower provided Smith with a copy of a report favorable to the prospects of a video tape cartridge system while

withholding the Stanford report. The undisputed facts show that Smith did not receive a copy of either report although he had a vague recollection of being told of the existence of both reports. *See* Deposition of Young M. Smith, Jr., May 18, 1976, pages 20–22.

January 20, 1972, confirmation slips (confirming plaintiff's purchase of an aggregate of 50,000 shares of Cartridge stock) were mailed to plaintiff from Hornblower's Greensboro office and that these confirmation slips were coded to indicate that Hornblower was acting as a dealer and/or market maker for its own account.[17] The language used on the confirmation slips was as follows:

ACTING AS DEALERS AND/OR MARKET MAKERS FOR OUR OWN ACCOUNT AND NOT AS YOUR BROKERS OR AGENTS. IN THIS TRANSACTION, OUR COMPENSATION, IF ANY, IS REALIZED BY SELLING THESE SECURITIES TO YOU AT A PROFIT TO OURSELVES. IF THIS TRANSACTION REPRESENTS A PURCHASE FROM YOU, OUR PROFIT, IF ANY, HAS BEEN OR WILL BE REALIZED ON RESALE BY US.[18]

Hornblower thus complies with Rule 15c1–4(a) (17 C.F.R. § 240.15c1–4(a)) of the Securities and Exchange Commission,[19] which provided in 1972:

The term "manipulative, deceptive, or other fraudulent device or contrivance," as used in section 15(c)(1) of the act, is hereby defined to include any act of any broker or dealer designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, any security . . . unless such broker or dealer, at or before the completion of each such transaction, gives or sends to such customer written notification disclosing (1) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person . . . ..

No additional disclosure is required. *See Batchelor v. Legg & Co.*, 52 F.R.D. 553 (D.Md.1971).

Plaintiff relies on *Cant v. A. G. Becker & Co.*, 374 F.Supp. 36 (N.D.Ill.1974), for the proposition that the confirmation slips were inadequate to notify plaintiff of Hornblower's status as dealer. In *Cant*, the court held that, under the circumstances of that case, coded confirmation slips did not constitute sufficient disclosure of the defendant's status as a dealer. However, the coded language of the confirmation slips used in *Cant* revealed merely that defendants were acting "for our own account as principal." 374 F.Supp. at 43.

In addition, the court in *Cant* relied heavily on the fact that the plaintiff therein had relied exclusively on the defendant's investment recommendations and for twenty-five years, the recommendations had always been followed, thus evidencing a special relationship between the plaintiff and the broker-dealer. In the present case, there is no evidence that such a relationship existed between plaintiff or Smith and any of the defendants.

*Suitability*

Plaintiff contends that Hornblower violated the NASD "suitability" rule[20] in connection with the January 20, 1972, purchase and is liable to the plaintiff by reason of that violation. The suitability rule provides:

In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security

---

17. *See* Deposition of George Jones with enclosures, August 20, 1975.

18. Identically coded confirmation slips were mailed to plaintiff in connection with her three previous Cartridge transactions in each of which Hornblower was acting as a dealer or market maker for its own account.

19. Promulgated pursuant to Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o (c)(1)).

20. Article III, § 2 of the Rules of Fair Practice of the National Association of Securities Dealers. Plaintiff has not pressed her allegations that NASD Rules 1, 12, 14, and 18 were violated by Hornblower in connection with the January 20, 1972, purchase.

holdings and as to his financial situation and needs.

 Under the clear weight of authority, there is no private right of action for alleged violations of NASD rules in the absence of facts which demonstrate fraud, independently cognizable under the anti-fraud provisions of the securities laws.[21] *See Hayden v. Walston & Co.*, 528 F.2d 901 (9th Cir. 1975); *Colonial Realty Corporation v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); *Carroll v. Bear, Stearns & Co.*, 416 F.Supp. 998 (S.D.N.Y.1976); *Architectural League v. Bartos*, 404 F.Supp. 304 (S.D.N.Y.1975); *Thompson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 401 F.Supp. 111 (W.D.Okla.1975); *Piper, Jaffray & Hopwood, Inc. v. Ladin*, 399 F.Supp. 292 (S.D.Iowa 1975); *Jenny v. Shearson, Hammill & Co., Inc.*, CCH Fed.Sec.L.Rep. ¶ 95,021 (S.D.N.Y.1975); *State of Utah v. Dupont Walston, Inc.*, CCH Fed.Sec.L.Rep. ¶ 94,812 (D.Utah 1974); *Wells v. Blythe & Co., Inc.*, 351 F.Supp. 999 (N.D.Cal.1972); *Mercury Investment Co. v. A. G. Edwards & Sons*, 295 F.Supp. 1160 (S.D.Texas 1969); *Wheeler v. Boettcher & Co.*, 539 P.2d 1322 (Colo.Ct.App.1975).

In *Colonial Realty*, generally recognized as the leading case on the subject, Judge Friendly discussed Rule 1 of the NASD rules, which is relied upon by plaintiff in this action. After discussing the purpose for requiring rules of fair practice by securities exchanges and associations, Judge Friendly stated the following guidelines as appropriate for consideration in determining whether an exchange or association rule gives rise to a private cause of action.

What emerges is that whether the courts are to imply federal civil liability for violation of exchange or dealer association rules by a member cannot be determined on the simplistic all-or-nothing basis urged by the two parties; rather, the court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law. The rules here at issue, however, are near the opposite pole. Although they do impose a duty upon members not to engage in conduct inconsistent with fair and equitable principles of trade, which the exchange or association can enforce through disciplinary proceedings, they are something of a catch-all which, in addition to satisfying the letter of the statute, preserves power to discipline members for a wide variety of misconduct, including merely unethical behavior which Congress could well not have intended to give rise to a legal claim. We find little reason to believe that by requiring exchanges and dealers' associations to include such provisions in their rules Congress meant to impose a new legal standard on members different from that long recognized by state law.

358 F.2d at 182.

Following the guidance of Judge Friendly in *Colonial Realty*, this Court holds that no private action exists for violations of the National Association of Securities Dealers Rules of Fair Practice. The Court is aware that the Seventh Circuit has held that there is a private action for alleged violations of NASD rules (*SEC v. First Securities Co.*, 463 F.2d 981 (7th Cir.), *cert. denied*, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); *Avern Trust v. Clarke*, 415 F.2d 1238 (7th Cir. 1969), *cert. denied*, 397 U.S. 963, 90 S.Ct. 997, 25 L.Ed.2d 255 (1970)), but rejects these decisions as being inconsistent with Judge Friendly's analysis in *Colonial Realty*.[22]

---

21. As discussed previously, plaintiff's anti-fraud claims present no genuine issue of fact for trial.

22. In her brief, plaintiff relies on Rule 405 ("know your customer" rule) of the New York Stock Exchange and cases recognizing private actions for alleged violations of that rule. However, Rule 405 is not referred to in the

Even if there were a private action for violations of NASD rules, there is no evidence that Hornblower violated the rather limited requirements of the suitability rule. By the explicit terms of the rule Hornblower was under no duty to make an independent investigation of plaintiff's finances. The NASD rule permits a broker to rely on "the facts, *if any*, disclosed by such customer." (Emphasis added). There is no affirmative duty on the broker to investigate or solicit facts.

The uncontradicted evidence establishes that neither Hornblower nor Ward had any reason to question the suitability of Smith's purchase of 50,000 shares of Cartridge stock for plaintiff's account. From all appearances, plaintiff was extremely wealthy with extensive securities and real estate holdings. Although plaintiff was in fact experiencing financial problems as of January 20, 1972, there is no evidence that these problems were disclosed to Ward or Hornblower.

Finally, the NASD suitability rule requires that a broker act in accordance with his knowledge of the customer's financial capabilities only when he *recommends* the purchase, sale, or exchange of any securities. There is no evidence that Ward or anyone else at Hornblower recommended that Smith purchase 50,000 shares of Cartridge stock for plaintiff's account.[23]

*Conspiracy*

The only allegation against defendant Avco is that of conspiracy allegedly in violation of § 17 of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. A valid primary securities law violation must be established by plaintiff as a prerequisite to liability for secondary conspiracy under the securities laws. Because the conspiracy claim against Hornblower and Avco Corporation is based on the misrepresentations and fraud claims previously discussed, the conspiracy claim must also fall. Similarly, the claim for punitive damages is moot.

### ORDER

It is, therefore, ORDERED that the defendants' motions for summary judgment be, and the same hereby are, allowed. A judgment will be entered accordingly.

---

Complaint or Amended Complaint. Moreover, the requirements of Rule 405 are significantly different from those of the NASD suitability rule. Therefore, the existence of a private right of action under Rule 405 does not lead to the conclusion that there is a corresponding right under the NASD suitability rule. *See Architectural League v. Bartos*, 404 F.Supp. 304 (S.D.N.Y.1975).

**23.** In answer to the question from plaintiff's counsel "Did Mr. Ward recommend to you that you take a major position in the security?", Smith answered "No." Deposition of Young M. Smith, Jr., May 18, 1976, page 93.